### SWICKARD v WAYNE COUNTY MEDICAL EXAMINER

Docket No. 89602. Argued March 6, 1991 (Calendar No. 6). Decided September 19, 1991.

Joe Swickard brought an action under the Freedom of Information Act in the Wayne Circuit Court against the Wayne County Medical Examiner, seeking release of an autopsy report and toxicology test results regarding the late Chief Judge of the 36th District Court, Longworth Quinn, Jr., in order that he might inspect and make copies of the documents. The court, Roland L. Olzark, J., denied the defendant's request for an evidentiary hearing and ordered that the documents be made available for inspection and copying. The Court of Appeals, SHEPHERD, P.J., and CYNAR and CAVANAGH, JJ., stayed execution of the order and allowed the decedent's mother and temporary personal representative of his estate to intervene. Thereafter, the Court of Appeals, CAVANAGH, P.J., and McDONALD and MARILYN J. KELLY, JJ., affirmed, finding that the FOIA compelled disclosure of the documents and determined that there was no need for an evidentiary hearing (Docket No. 127076). The defendant appeals.

In an opinion by Justice RILEY, joined by Chief Justice CAVANAGH and Justices BRICKLEY and BOYLE, the Supreme Court held:

The Wayne County Medical Examiner was not justified under the Freedom of Information Act in withholding the autopsy report and toxicology test results regarding Judge Quinn because the disclosure would not amount to a clearly unwarranted invasion of privacy of the late judge or his family under MCL 15.243(1)(a); MSA 4.1801(13)(1)(a). The physician-patient privilege is inapplicable under the facts of this case, and thus neither § 13(1)(a) nor § 13(1)(i) exempts the documents from

REFERENCES

Am Jur 2d, Records and Recording Laws §§ 46.14-46.16, 46.19.

What are "records" of agency which must be made available under state freedom of information act. 27 ALR4th 680.

What constitutes personal matters exempt from disclosure by invasion of privacy exemption under state freedom of information act. 26 ALR4th 666.

disclosure. The trial court did not err in refusing the defendant's request for an evidentiary hearing.

1. The Freedom of Information Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.*, entitles all persons to full and complete information with regard to the affairs of government and the official acts of those who represent them as public officials and public employees so that they may fully participate in the democratic process. Upon request describing a public record, a person has a right to inspect, copy, or receive copies of the record unless release is exempted by § 13 of the act. A policy of full disclosure underlies the FOIA. When a public body refuses to disclose a requested document under the act and the requester sues to compel disclosure, the public agency bears the burden of proving that the refusal was justified. The FOIA is intended primarily as a prodisclosure statute and the exemptions to disclosure are to be narrowly construed.

2. Section 13(1)(a) of the Freedom of Information Act provides that a public body may exempt from disclosure as a public record information of a personal nature where public disclosure would constitute a clearly unwarranted invasion of a person's privacy. To determine whether disclosure of requested information would violate any privacy rights, the common law and constitutional law as well as customs, mores, or ordinary views of the community are considered. An action for invasion of privacy can be maintained only by a living person whose privacy would be invaded. Such an action may not be maintained on behalf of a decedent whose privacy might be invaded; nor is the right assignable. Thus, Judge Quinn's common-law privacy rights in disclosure of the disputed autopsy results are virtually nonexistent.

3. Because the common-law right of privacy is personal, the relatives of deceased persons who are objects of publicity may not maintain actions for invasion of privacy unless their own privacy is violated; for an invasion to occur, a relative must be brought into unjustifiable publicity. In this case, disclosure of the autopsy report and test results under the FOIA would not threaten any privacy rights of Judge Quinn. FOIA rights expire with the holder of the rights. The material is not personal, intimate, or embarrassing to the family. The findings of the medical examiner relate solely to the deceased, not the family. Upon review of the law of privacy, the circumstances surrounding the death of a leading legal figure in the community, and in view of the fact that the FOIA is a prodisclosure statute with narrowly construed exemptions, the defendant failed to meet

his burden that the materials at issue are information of a personal nature.

4. MCL 600.2157; MSA 27A.2157, the physician-patient privilege, protects the confidential nature of the physician-patient relationship, encouraging free discussion between the doctors and their patients and ensuring that communications between the two are confidential. Since there is no communication in an autopsy, applying the privilege to an autopsy would not further the purpose of the act. The information acquired in the performance of an autopsy falls outside the scope of the privilege.

5. In this case, the trial court did not err in refusing an evidentiary hearing. The record was sufficient to make a ruling without a formal evidentiary hearing.

Justice GRIFFIN concurred in the result only.

Affirmed.

Justice LEVIN, writing separately, stated that the family of a deceased person has a privacy interest in an autopsy report and toxicology test results. Such a report and test results contain information of a personal nature. In this case, the Wayne County Medical Examiner sustained the burden of demonstrating that disclosure would constitute a clearly unwarranted invasion of the personal privacy of the decedent's family.

In applying a Freedom of Information Act privacy exemption, a court should balance the interests in disclosure and nondisclosure. Generally, disclosure cannot be justified if it would reveal little or nothing about, or fail to shed any light on, the conduct of a government agency or official. An autopsy report and toxicology test results prepared and obtained by a county medical examiner are investigatory records compiled for law-enforcement purposes and constitute information of a personal nature, in which the family of a deceased person has an individual privacy and a personal privacy interest. Disclosure of such information concerning a private citizen generally would reveal little or nothing about, or shed any light on, the conduct of a government agency or official.

The invasion-of-privacy exemption should not be construed as including only those privacy rights cognizable at common law or protected by the constitution. The FOIA is a prodisclosure statute, requiring that all records compiled or maintained by a public body be made available unless the record is within an enumerated exemption. Where an enumerated exception is relied on, the court must determine the matter de novo, and the burden is on the public body asserting the exception to sustain its applicability. The reason for requesting particular material, the identity of the person making a request, or the

purpose for which a record is sought is not relevant to a determination whether disclosure would constitute an unwarranted invasion of privacy. A circuit court, in making its determination of the merits of an asserted privacy exemption, must balance the interests in disclosure and nondisclosure. The focus in disclosure is on citizens' rights to be informed about what their government is up to, and cannot be justified if it would reveal little or nothing about, or fail to shed any light on, the conduct of a government agency or official. The primary function of a medical examiner is to determine whether a person's death was the result of unlawful means. The sole reason for authorizing an autopsy and toxicology test is to determine whether a criminal offense was committed. An autopsy report and toxicology test results prepared by a medical examiner are investigating records compiled for law-enforcement purposes.

The individual and personal privacy interests of individual members of a family outweigh the public's interest in disclosure. Individual autopsy reports tell nothing about matters of substantive law-enforcement policy that are properly the subject of public concern. While balance might favor disclosure where the public record evidences official misconduct in office, in this case, there is no such claim; rather, there is only a hint of misconduct out of office by a person who was in office. Disclosure would subject the decedent's family to reputational loss with no appropriate forum to address the effects of disclosure, would not inform the public about what the government is up to, and would reveal little or nothing about the conduct of a government agency or official.

Justice MALLETT, dissenting, concurred in part with Justice LEVIN.

184 Mich App 662; 459 NW2d 92 (1990) affirmed.

1. RECORDS — PUBLIC BODIES — FREEDOM OF INFORMATION ACT — EXEMPTIONS.

A public body may exempt from disclosure as a public record information of a personal nature where the public disclosure would constitute a clearly unwarranted invasion of an individual's privacy; to determine whether disclosure of requested information violates any privacy rights, the common law and constitutional law as well as customs, mores, or ordinary views of the community are to be considered (MCL 15.243[1][a]; MSA 4.1801[13][1][a]).

2. PRIVACY — CAUSES OF ACTION — PROPER PARTIES.

An action for invasion of privacy may be maintained only by a

living person whose privacy is invaded; such an action may not be maintained on behalf of a decedent whose privacy might be invaded, nor is the right assignable.

3. PRIVACY — CAUSES OF ACTION — PROPER PARTIES — FAMILY MEMBERS.

   Relatives of a decedent who are objects of publicity related to the decedent's death may not maintain actions for invasion of privacy unless their own privacy has been violated.

4. PHYSICIANS-SURGEONS — PHYSICIAN-PATIENT PRIVILEGE — AUTOPSY REPORTS.

   The physician-patient privilege does not apply to disclosure of the results of an autopsy (MCL 600.2157; MSA 27A.2157).

*Honigman, Miller, Schwartz & Cohn* (by *Herschel P. Fink* and *Sandra L. Jasinski*) for the plaintiff.

*Saul A. Green,* Wayne County Corporation Counsel, and *Ellen E. Mason,* Assistant Corporation Counsel, for the defendant.

*Bell & Gardner, P.C.* (by *Samuel C. Gardner, Frank D. James,* and *Athina T. Siringas*), for the intervenor.

RILEY, J. In this appeal, we are asked to decide whether an autopsy report and toxicology test results regarding the late Chief Judge of the 36th District Court, Longworth Quinn, Jr., are properly exempt from disclosure under the state's Freedom of Information Act, MCL 15.231 *et seq.*; MSA 4.1801(1) *et seq.* We are further asked to determine whether the trial court erred in refusing defendant's request for an evidentiary hearing. We hold that defendant was not justified under the FOIA in withholding the autopsy report and test results. We further hold that the lower court did not err in refusing defendant's request for an evidentiary hearing. Accordingly, we affirm the decision of the Court of Appeals.

### I. FACTS AND PROCEEDINGS

On January 4, 1990, the Honorable Longworth Quinn, Jr., was found shot to death in his mother's home. On January 5, the Wayne County Medical Examiner's office performed an autopsy on the body of Judge Quinn.[1] The postmortem examination found that the immediate cause of death was a self-inflicted gunshot wound to the head.[2] The death certificate listed no other causes of death.

Within days after the body was found, Roger Chesley, Jim Finkelstein, and plaintiff Joe Swickard wrote an article in the Detroit Free Press concerning the death of Judge Quinn.[3] At one point, the article stated:

> Law enforcement officials familiar with the investigation indicated that drug paraphernalia was found in the west-side Detroit home of Quinn's mother, where the 46-year-old chief judge of 36th District Court had been house-sitting. . . . Authorities said they had not determined the significance of any items recovered.

The article also stated that "[f]riends and colleagues said they knew of nothing that would suggest Quinn used drugs."

On January 23, 1990, plaintiff wrote to Dr. Bader J. Cassin, the Wayne County Medical Examiner and defendant in this action, requesting under the FOIA that the autopsy report and toxicology test results be released so that plaintiff could inspect and make copies of the documents. Plain-

---

[1] The autopsy was performed under the authority of MCL 52.202; MSA 5.953(2), which requires the medical examiner to investigate the cause of death of persons who die violently, unexpectedly, or without medical attention during the forty-eight hours prior to death.

[2] This information can be found on the certificate of death.

[3] The article appeared in the Detroit Free Press and was entitled *Friends say judge showed no troubles before his suicide.*

tiff intended to use the information in an article he planned to write for the Detroit Free Press. On January 29, 1990, defendant advised that he would only release the information upon receipt of a "duly executed authorization" by the decedent's next of kin.

On March 14, 1990, plaintiff filed suit in the Wayne Circuit Court,[4] claiming that the FOIA required defendant to release the results of the postmortem examination. The complaint and an order to show cause were served on defendant on March 19. Defendant answered the complaint and claimed that the FOIA exempted the requested information from disclosure, and defendant requested an evidentiary hearing pursuant to MCL 15.240(3); MSA 4.1801(10)(3). On March 23, the court[5] refused defendant's request for an evidentiary hearing, and the court introduced into the record the parties' agreement regarding the substance of the defendant's proposed testimony. On the same day, the trial court entered an order requiring defendant to make available "all autopsy reports, toxicology test results and related documents" for plaintiff's inspection and copying.

Defendant appealed the decision, and the Court of Appeals stayed execution of the order. On April 24, 1990, the Court of Appeals allowed Dorothy Quinn, the decedent's mother and temporary personal representative of his estate, to intervene in the action. On July 16, 1990, the Court of Appeals affirmed the trial court's decision, and found that the FOIA compelled disclosure of the documents. The Court also determined that the trial court properly ruled that there was no need

[4] The action was filed pursuant to MCL 15.240(1); MSA 4.1801(10)(1).

[5] The case was heard by the Honorable Roland L. Olzark.

for an evidentiary hearing. 184 Mich App 662; 459 NW2d 92 (1990).

Defendant appealed the Court of Appeals decision, and this Court granted leave to appeal on October 24, 1990. 436 Mich 881.

## II. INTRODUCTION TO FOIA

Before the enactment of the FOIA in 1977, Michigan enjoyed a long history of allowing citizens free access to public records. *Booth Newspapers, Inc v Muskegon Probate Judge,* 15 Mich App 203; 166 NW2d 546 (1968). In *Booth,* the Court of Appeals stated:

> The fundamental rule in Michigan on the matter before us, first enunciated in the case of *Burton v Tuite* (1889), 78 Mich 363 [44 NW 282], is that citizens have the general right of free access to, and public inspection of, public records.
>
> The *Nowack* [*v Auditor General,* 243 Mich 200; 219 NW 749 (1928)] decision has "placed Michigan at the vanguard of those states holding that a citizen's accessibility to public records must be given the broadest possible effect." [*Id.* at 205, 207.]

Some ten years after the federal FOIA was enacted by Congress, Michigan enacted its FOIA in 1977. One of the reasons prompting the legislation was concern over abuses in the operation of government. A policy of full disclosure underlies the FOIA. The preamble to the act, MCL 15.231(2); MSA 4.1801(1)(2), provides:

> It is the public policy of this state that all persons are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees, consistent with this

act. The people shall be informed so that they may fully participate in the democratic process.

Section 3(1) of the act states:

> Upon an oral or written request which describes the public record sufficiently to enable the public body to find the public record, a person has a right to inspect, copy, or receive copies of a public record of a public body, except as otherwise expressly provided by section 13.

Therefore, all public records are subject to full disclosure under the act unless the material is specifically exempt under § 13. Also, when a public body refuses to disclose a requested document under the act, and the requester sues to compel disclosure, the public agency bears the burden of proving that the refusal was justified under the act. MCL 15.240(1); MSA 4.1801(10)(1).

In construing the provisions of the act, we keep in mind that the FOIA is intended primarily as a prodisclosure statute and the exemptions to disclosure are to be narrowly construed.[6] *State Employees Ass'n v Dep't of Management & Budget,* 428 Mich 104; 404 NW2d 606 (1987).

---

[6] In Easterbrook, *Privacy and the optimal extent of disclosure under the Freedom of Information Act,* 9 J Legal Stud 775, 776-777 (1980), Professor Easterbrook wrote:

> The strength of the FOIA's prodisclosure presumption is demonstrated by the rule that any document must be disclosed unless there is explicit authorization for withholding. The privacy exemption (exemption 6) allows withholding only when necessary to prevent "clearly unwarranted" invasions of privacy. There are two built-in administrative biases in favor of disclosure. First, the exemptions are permissive; they allow withholding but never require it. Second, although sanctions are available to penalize an official who improperly withholds a document, there are no sanctions for wrongful release of a document.

Although the professor's remarks are spoken in regard to the federal FOIA, they also apply to Michigan's statute.

Defendant does not dispute that the county medical examiner's office is a "public body," nor does he dispute that the test results and report requested by plaintiff are "public records." We agree that the county coroner's office is a "public body" under § 2(b)(iii) of the act.[7] We also believe that the documents prepared by defendant were prepared "in the performance of an official function," and are therefore "public records."[8]

### III. DISCUSSION OF EXEMPTION § 13(1)(a)

Section 13(1)(a) of the FOIA provides:

A public body may exempt from disclosure as a public record under this act:

Information of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy. [MCL 15.243(1)(a); MSA 4.1801(13)(1)(a).]

Defendant and the intervenor contend that this exemption justifies defendant's refusal to disclose the documents. We most recently encountered

---

[7] "Public body" means:

*    *    *

A county, city, township, village, intercounty, intercity, or regional governing body, council, school district, special district, or municipal corporation, or a board, department, commission, council, or agency thereof. [MCL 15.232(b)(iii); MSA 4.1801(2)(b)(iii).]

[8] "Public record" means a writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created. This act separates public records into 2 classes: (i) those which are exempt from disclosure under section 13, and (ii) all others, which shall be subject to disclosure under this act. [MCL 15.232(c); MSA 4.1801(2)(c).]

§ 13(1)(a) in *State Employees Ass'n, supra.*[9] In *State Employees Ass'n,* the plaintiff was the labor representative of 26,000 civil service employees. The plaintiff requested under the FOIA that the Department of Management and Budget disclose information containing the home addresses of the employees. The department, the defendant in the case, withheld the addresses, claiming that disclosure would constitute a " 'clearly unwarranted invasion of privacy' " under § 13(1)(a). *Id.* at 123. While interpreting the notion of "privacy" under § 13(1)(a), in the lead opinion Justice CAVANAGH wrote:

> The Legislature made no attempt to define the right of privacy. We are left to apply the principles of privacy developed under the common law and our constitution. The contours and limits are thus to be determined by the court, as the trier of fact, on a case-by-case basis in the tradition of the common law. Such an approach permits, and indeed requires, scrutiny of the particular facts of each case, to identify those in which ordinarily impersonal information takes on "an intensely personal character" justifying nondisclosure under the privacy exemption. [*Id.*]

In an earlier case discussing § 13(1)(a), *Kestenbaum v Michigan State Univ,* 414 Mich 510, 528, n 7; 327 NW2d 783 (1982), Chief Justice FITZ-GERALD noted:

> Determining the degree of an invasion of privacy should not be a difficult task for courts, since they have demonstrated their abilities to do so in other areas. When the phrase "clearly unwar-

---

[9] Other Supreme Court cases interpreting § 13(1)(a) are *Kestenbaum v Michigan State Univ,* 414 Mich 510; 327 NW2d 783 (1982); *Tobin v Civil Service Comm,* 416 Mich 661; 331 NW2d 184 (1982); *Int'l Union, United Plant Guard Workers of America v Dep't of State Police,* 422 Mich 432; 373 NW2d 713 (1985).

ranted invasion of privacy" is used in tort litiga-
tion, "courts have quantified the magnitude of the
infringement by deciding whether the matters or
information made public would be 'offensive and
objectionable to a reasonable man of ordinary
sensibilities.' The customs, mores, or ordinary
views of the community have been used as refer-
ences in this determination." (Footnotes omitted.)
Hoglund & Kahan, *Invasion of Privacy and the
Freedom of Information Act:* Getman v NLRB, 40
Geo Wash L R 527, 539 (1972). A similar approach
under the FOIA may avoid potential inequities.

Thus, we look to the common law and constitu-
tional law to guide us in determining whether
disclosure of the requested information would vio-
late any privacy rights under the FOIA. In doing so,
we recognize that the common law and constitu-
tional law may not be coextensive with the scope
of privacy under the FOIA, but they nonetheless
provide valuable anchors for our FOIA analysis. In
gauging the scope of the FOIA's privacy exemption,
we also consider the "customs, mores, or ordinary
views of the community . . . ."

Our first inquiry under § 13(1)(a) is whether the
requested material is "[i]nformation of a personal
nature." *The American Heritage Dictionary of the
English Language: Second College Edition,* p 925
(1976) defines "personal," in relevant part, as "[o]f
or pertaining to a particular person; private; one's
own . . . . Concerning a particular individual and
his intimate affairs, interests, or activities;
intimate . . . ." In discussing this threshold in-
quiry in *Kestenbaum, supra,* p 549, Justice RYAN
defined it as "personal, intimate, or embarrassing"
information. If we decide that disclosure threatens
an invasion of privacy, then we inquire with re-
gard to whether the invasion would be "clearly
unwarranted."

### A. JUDGE QUINN'S COMMON-LAW PRIVACY RIGHT

Defendant and the intervenor assert that the requested information, if released, would constitute a clearly unwarranted invasion of the late Judge Quinn's privacy. We find it helpful to our analysis to analogize to the common law of privacy. Thus, we evaluate the effect that disclosure of the test results would have on Judge Quinn's common-law privacy rights.

Section 652I of the Restatement of Torts states the general rule with regard to privacy rights of a deceased person:

> Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a *living* individual whose privacy is invaded. [3 Restatement Torts, 2d, § 652I, p 403. Emphasis added.]

Comment (b) to the section provides that "[i]n the absence of a statute, the action for the invasion of privacy cannot be maintained after the death of the individual whose privacy is invaded."

Along the same lines, Prosser writes:

> The right [of privacy] is not assignable, and while the cause of action may or may not survive after his death, according to the survival rules of the particular state, there is no common law right of action for a publication concerning one who is already dead. [Prosser, Torts (4th ed), § 117, p 815.]

The Court of Appeals also followed this rule in *Fry v Ionia Sentinel-Standard,* 101 Mich App 725, 730; 300 NW2d 687 (1980).

There are no statutes in Michigan creating an action on behalf of Judge Quinn for violation of a right of privacy. Consistent with the rules set out

above, we would find Judge Quinn's common-law privacy rights in disclosure of the disputed autopsy results to be virtually nonexistent.

### B. QUINN FAMILY'S COMMON-LAW PRIVACY RIGHTS

Defendant and the intervenor further argue that disclosure would constitute a clearly unwarranted invasion of the privacy of the decedent's family. Again, to assist in our FOIA analysis we look to the common law and examine the scope of the family's common-law privacy rights in the autopsy results.

The common-law privacy claim that most closely resembles the assertions by defendant and the intervenor that disclosure would violate the family's privacy right is public disclosure of embarrassing private facts.[10] In *Fry,* the Court of Appeals stated that public disclosure of embarrassing private facts "requires that the disclosed information be highly offensive to a reasonable person and of no legitimate concern to the public." 101 Mich App 728. See also *Beaumont v Brown,* 401 Mich 80; 257 NW2d 522 (1977).

Comment (a) to § 652I of the Restatement of Torts states:

The right protected by the action for invasion of

---

[10] Justice LEVIN in *UPGWA v Dep't of State Police,* n 9 *supra,* pp 453-454, n 42, stated:

A showing that disclosure would constitute the tort of "public disclosure of private facts" would seem to evidence that requested information is personal and private. [Citing *Hubert v Harte-Hanks Texas Newspapers, Inc,* 652 SW2d 546 (Tex App, 1983).]

While arguably the parties could assert the intrusion theory, that theory requires that the information be obtained " 'through some method objectionable to the reasonable man.' " *Tobin,* n 9 *supra* at 672. The means of obtaining the information in this case, a letter of request, is not an intrusive means which would be objectionable to the reasonable person.

privacy is a personal right, peculiar to the individ-
ual whose privacy is invaded. The cause of action
is not assignable, and it cannot be maintained by
other persons such as members of the individual's
family, unless their own privacy is invaded along
with his. [*Id.* at 403.]

Prosser offers a similar comment on the subject:

As to any of the four, it is agreed that the
plaintiff's right is a personal one, which does not
extend to members of his family, unless, as is
obviously possible, their own privacy is invaded
along with his. [Prosser, *supra,* § 117, pp 814-815.]

Keeping in mind that the right of privacy is a
personal right, which can only be asserted by
persons whose rights have been invaded, we evalu-
ate whether the family's common-law rights of
privacy are implicated in the autopsy information.

In *Fry,* the defendant published an article stat-
ing that the decedent, the plaintiff's husband, and
another woman were believed to have perished in
a house fire. The article went on to state the
names and relations of the plaintiff and her chil-
dren to the decedent. The plaintiff brought an
action against the defendant for invasion of pri-
vacy. The Court of Appeals referred to the Restate-
ment of Torts in discussing that a successful claim
of public disclosure of embarrassing private facts
requires that the matter not be of legitimate pub-
lic concern:

"Authorized publicity includes publications con-
cerning homicide and other crimes, arrests, police
raids, suicides, marriages and divorces, accidents,
fires, catastrophes of nature, a death from the use
of narcotics, a rare disease, the birth of a child to
a twelve-year-old girl, the reappearance of one

supposed to have been murdered years ago, a
report to the police concerning the escape of a wild
animal and many other similar matters of genu-
ine, even if more or less deplorable, popular ap-
peal." 3 Restatement Torts, 2d, § 652D, comment g,
pp 390-391. [101 Mich App 730.]

The Court went on to say that

an action for invasion of privacy cannot be main-
tained by a relative of the person concerned, un-
less that relative is brought into unjustifiable pub-
licity. [*Id.*]

The Court held that the plaintiff could not main-
tain a privacy action because the article did not
discuss private facts about the plaintiff, the mat-
ters concerning her and her children were taken
from public record, the material relating to the
plaintiff was not highly offensive to a reasonable
person, and the article dealt with a subject matter
of legitimate public interest.

In *Andren v Knight-Ridder Newspapers,* 10 Med
L Rptr 2109 (ED Mich, 1984), the plaintiff sued the
defendant for invasion of privacy after the defen-
dant published an article recounting the facts
surrounding the murder of the plaintiff's daugh-
ter. The author of the story supplied excerpts from
the deceased's diary. Applying Michigan law, the
court determined that the plaintiff had no stand-
ing to maintain an action for invasion of privacy.
The court found that the plaintiff's private life
had not been made public, even though the article
mentioned her name, identified her as the victim's
mother, and gave some background information on
the family. The court found that the statements
with regard to the family would not be offensive to
the reasonable person. The court also noted that

the article was newsworthy because

> [e]ven though the murder occurred 1500 miles
> from the Free Press's readership, it certainly could
> be of concern to a reading public who would
> consider leaving the so-called high crime of Michi-
> gan for the glamour of South Florida. [*Id.* at 2111.]

The court concluded that the mother had no stand-
ing to sue.

In *Cordell v Detective Publications, Inc*, 419 F2d
989 (CA 6, 1969), the court, applying Tennessee
law, disallowed the plaintiff's action for invasion
of privacy. The defendant wrote an article sensa-
tionalizing the murder of the plaintiff's daughter.
In finding that the plaintiff could not bring an
action for public disclosure of private matters, the
court highlighted the rule that the cause of action
is personal and only to be asserted by those who
are subjects of the publication. The court stated:

> Consequently, the right lapses with the death of
> the person who enjoyed it, and one cannot recover
> for this kind of invasion of the privacy of a rela-
> tive, no matter how close the relationship. [419
> F2d 990-991.]

The court went on to discuss the policy behind
the rule:

> The policy underlying these limitations is not
> hard to discern. The law is not unwisely wary of
> actions for injury which is purely emotional; the
> danger of spurious claims is too great. See Rest 2d
> Torts, § 436A (1966). . . .
> As one court put it, "if the right asserted here
> were sustained, it would be difficult to fix its
> boundaries." *Kelley v Post Pub Co,* 327 Mass 275,
> 277; 98 NE2d 286, 287 (1951). How distant a
> relative could sue? At what relational distance
> does the danger of feigned claims overcome the
> likelihood of real emotional distress? [*Id.* at 991-
> 992.]

Finally, the court wrote that

the prevailing authority, which we believe would be followed in Tennessee, does not regard an injury inflicted on the daughter as giving rise to a cause of action by the mother in her own right. [*Id.* at 992.]

In *Smith v City of Artesia,* 108 NM 339; 772 P2d 373 (1989), the plaintiffs sued the defendant, claiming that their constitutional rights of privacy were violated after learning that the police, in investigating the murder of the plaintiffs' daughter, circulated nude photographs of her which were taken after she died. Before deciding the constitutional question, the court discussed the common-law right of privacy. The court stated:

Isolated commentary supports a cause of action for the relatives of a decedent whose private life is publicized. E.g., Green, *Relational Interests,* 29 Ill L Rev 460, 485-490 (1934). Yet judicial concerns about framing the scope of the tort and its possible misuse, as well as traditional reluctance to permit damages that are solely emotional, have outweighed natural revulsion to abuse of the dead. See *Justice v Belo Broadcasting Corp,* 472 F Supp 145, 147-148 (ND Tex, 1979). The great weight of judicial authority is against granting relatives of a decedent a cause of action for invasion of privacy arising from disclosures about the decedent. See Annotation, *Invasion of Privacy by Publication Dealing With One Other Than Plaintiff,* 18 ALR3d 873 (1968) . . . . Reporter's Note to Restatement, *supra,* § 652I. [*Id.* at 341.]

We follow the general rule that the right of privacy is personal, and the relatives of deceased persons who are objects of publicity may not maintain actions for invasion of privacy unless their

own privacy is violated. There is no relational right to privacy in Michigan. We agree with *Fry* that for an invasion to occur, the relative must be brought into "unjustifiable publicity."

### C. QUINN FAMILY'S CONSTITUTIONAL RIGHTS TO PRIVACY

As a reference point, we also look to constitutional notions of privacy in formulating the scope of "personal information" protected under § 13(1)(a). Defendant and the intervenor assert that the family's constitutional right of privacy would be implicated if the autopsy report and test results were released.

In *Whalen v Roe,* 429 US 589, 599-600; 97 S Ct 869; 51 L Ed 2d 64 (1977), the United States Supreme Court described two kinds of privacy interests: "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." Defendant asserts that the family has an interest in avoiding disclosure of personal matters contained in the autopsy report and toxicology results.

Similar to the common-law right of privacy, the constitutional right of privacy is a personal right to be asserted only by the person whose right has been violated.[11]

In *Hubenschmidt v Shears,* 403 Mich 486; 270 NW2d 2 (1978), the plaintiffs challenged admission into evidence of blood-alcohol test results removed from the bodies of the plaintiffs' decedents in consolidated wrongful death actions. The Court found the results could properly be admitted into evidence, stating:

---

[11] 16B CJS, Constitutional Law, § 631(a), p 317.

We are not concerned in these cases with issues of search and seizure/right to privacy, security of person or statutory construction which were raised in *Lebel v Swincicki* [354 Mich 427; 93 NW2d 281 (1958)], and *McNitt v Citco Drilling Co,* 397 Mich 384; 245 NW2d 18 (1976). Both of those cases dealt with extraction of a blood sample from a person still alive. Indeed, in *Lebel,* it is noted that:

"the right to privacy is a personal one which ends with the death of the person to whom it is of value, and it may not be claimed by his estate or by his next of kin." 354 Mich 440. [*Id.* at 489. See also *McLean v Rogers,* 100 Mich App 734; 300 NW2d 389 (1980).]

In evaluating the constitutional right of privacy claims, the court in *Smith v City of Artesia, supra* at 342 stated:

Indeed, both a common sense understanding of privacy and precedent of the United States Supreme Court argue against recognition of a privacy interest in another person. Privacy is inherently personal. The right to privacy recognizes the sovereignty of the *individual.* The notion of privacy as an expression of individual sovereignty underlies the proposition that the constitutional right to privacy finds support in the ninth amendment to the Constitution, which provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." [Emphasis in original.]

The court in *Smith* held that the parents had no constitutional privacy claim against the defendants who circulated a photograph of their deceased daughter.

Although *Hubenschmidt* and *McLean* deal with the right of privacy under the Fourth Amend-

ment,[12] we believe that the rulings are equally applicable to the right of privacy under the Fourteenth Amendment. Constitutional rights of privacy are personal. A deceased person loses the right of privacy, and the right cannot be asserted by the next of kin. It is against this backdrop that we assess defendant's claim that § 13(1)(a) exempts matters contained in the autopsy report from disclosure.

### IV. ANALYSIS

We recognize that § 13(1)(a) protects information from disclosure when it would constitute a "clearly unwarranted invasion of an *individual's* privacy." (Emphasis added.) The only individuals we concern ourselves with are Judge Quinn and his family. Defendant has the burden of proving that the privacy exemption applies, and defendant argues only that disclosure would invade decedent's and the family's privacy rights.

Our review of the common law and constitutional law is helpful insofar as we are given points of reference through a highly subjective area of the law where the Legislature has provided little statutory guidance on the notion of privacy contained in the FOIA.

In the instant case, we find that disclosure of the autopsy report and test results would not threaten any privacy rights of Judge Quinn under the FOIA. In this regard, we note the majority rule under the federal FOIA, 5 USC 551, that FOIA privacy rights expire with the holder of the rights.[13] Further-

---

[12] It is not clear whether *Hubenschmidt* addresses the federal or Michigan constitutional right to privacy. However, the Fourth Amendment and Const 1963, art 1, § 11 are considered to be substantively the same.

[13] *Diamond v FBI*, 532 F Supp 216, 227 (SD NY, 1981); *Rabbitt v*

more, the common law and constitutional law provide that rights of action for invasion of privacy perish with the individual.

We further decline to accept the position of defendant and intervenor that the material is "personal, intimate, or embarrassing" to the family, and that it constitutes "information of a personal nature."[14] The findings of the medical exam-

*Dep't of the Air Force,* 383 F Supp 1065, 1070 (SD NY, 1974); *United States v Schlette,* 842 F2d 1574, 1581 (CA 9, 1988).

[14] The dissent cites *Marzen v Dep't of Health & Human Services,* 825 F2d 1148 (CA 7, 1987), to support its position that the family's privacy rights under the FOIA would be invaded by disclosure of the autopsy report. However, *Marzen* is distinguishable from the instant case. In *Marzen,* a baby was born with Down syndrome and a blocked esophagus. When faced with a choice of surgery to correct the esophageal problem, the parents decided against surgery and chose only to treat the baby to enhance its comfort. The baby died shortly thereafter.

The plaintiff requested infant Doe's medical records under the federal FOIA, 5 USC 552. The court discussed the records which were sought:

[T]he plaintiff seeks access to the intimate detailed medical records which chart the infant's deteriorating condition, conversations between his parents and doctors, and the anguished reactions of the infant's parents. [825 F2d 1153.]

The court determined that refusal to disclose the records was justified under exemption 6 protecting " 'personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion[ ] of personal privacy.' " *Id.* at 1154.

While it is true that the court found the parents would suffer an invasion of privacy under the FOIA if the records were released, the records reflected not only the condition of the baby, but they contained personal information about the parents. The parents were intimately involved with the process of the infant's death, and parental decisions which affected the baby's condition were undoubtedly reflected in the medical records. In contrast, the records at issue in the instant case do not contain any intimate details about family members of Judge Quinn.

Another case relied on by the dissent is *Badhwar v United States Dep't of the Air Force,* 264 US App DC 397; 829 F2d 182 (1987). In *Badhwar,* the court remanded because the trial court did not consider the requests for certain portions of autopsy reports under exemption 6 (invasion of personal privacy). In an isolated statement, and with virtually no analysis, the court stated that presumably some autopsy reports "would not be of a kind that would shock the sensibilities of

iner relate solely to the deceased, not the family. No private facts concerning the family would be revealed by the release of the information. Even if the toxicology results were to disclose an illegal narcotic in the blood stream of Judge Quinn at the time of death, the disclosure would not reveal any information personal to the family of the deceased. It would be at best a comment on the lifestyle of the deceased and in no way would reflect on the lifestyle of any family member. Furthermore, the circumstances surrounding the alleged suicide of a public figure and Chief Judge of the 36th District Court are matters of legitimate public concern.[15]

Upon review of the law of privacy, the circumstances surrounding the death of a leading legal figure in the community, and in view of the fact that the FOIA is a prodisclosure statute with narrowly construed exemptions, we conclude that defendant has failed to meet his burden that the autopsy report and test results are "information of a personal nature." Having found initially that no "invasion of privacy" is threatened, we need not address whether an invasion was "clearly unwarranted."[16]

surviving kin. Others clearly would." *Id.* at 401. In the last analysis, the *Badhwar* court did not consider the request for autopsy reports under exemption 6, but remanded.

[15] In determining the involvement of privacy interests in the case, courts may find it helpful to look to the " 'customs, mores, or ordinary views of the community . . . .' " *Kestenbaum,* 414 Mich 528, n 7. In this regard, we note that the practice of the Wayne County Medical Examiner from 1972 to 1988 was to treat autopsy reports and toxicology reports as public records and to make them available to the public upon request. Apparently, the longstanding practice has changed within the last three years. The fact that the custom was to release the records upon request for sixteen years prior to 1988 lends support to our view that no privacy interest would be implicated by release of the examination results.

[16] Justice LEVIN relies heavily on § 13(1)(b)(iii), the law-enforcement exemption, in arguing that the autopsy report is a law-enforcement record which cannot be disclosed without causing an invasion of privacy. However, the exemption pertaining to law-enforcement re-

## V. PHYSICIAN-PATIENT PRIVILEGE

Defendant and the intervenor also argue that § 13(1)(d) and § 13(1)(i) justify defendant's refusal to disclose the documents because the physician-patient privilege bars disclosure of the information. These subsections provide:

(1) A public body may exempt from disclosure as a public record under this act:

\* \* \*

(d) Records or information specifically described and exempted from disclosure by statute.

\* \* \*

(i) Information or records subject to the physician-patient, psychologist-patient, minister, priest or Christian Science practitioner, or other privilege recognized by statute or court rule. [MCL 15.243(1)(d)(i); MSA 4.1801(13)(1)(d)(i).]

The physician-patient privilege is set out in MCL 600.2157; MSA 27A.2157:

Except as otherwise provided by law, a person duly authorized to practice medicine or surgery shall not disclose any information that the person has acquired in attending a patient in a professional character, if the information was necessary to enable the person to prescribe for the patient as a physician, or to do any act for the patient as a surgeon.

---

cords is not an issue which is properly before this Court. Defendant has the burden of justifying his refusal to disclose the autopsy report and test results. Defendant never argued below that this exemption applies, nor did defendant raise § 13(1)(b)(iii) in his application for leave to appeal. MCR 7.302(F)(4)(a) states:

Unless otherwise ordered by the Court, appeals shall be limited to the issues raised in the application for leave to appeal.

The question we must answer is whether the privilege attaches to a situation where a doctor, in the performance of an autopsy, acquires information about the deceased. In *Schechet v Kesten,* 372 Mich 346, 351, n 3; 126 NW2d 718 (1964), the Court stated that " '[t]he statute is one passed for the sole purpose of enabling persons to secure medical aid without betrayal of confidence.' " In *Gaertner v Michigan,* 385 Mich 49, 53; 187 NW2d 429 (1971), this Court stated that the purpose of the act "is to protect the confidential nature of the physician-patient relationship." And in *Drouillard v Metropolitan Life Ins Co,* 107 Mich App 608, 617; 310 NW2d 15 (1981), the Court of Appeals wrote that the purpose of the privilege "is to encourage free discussion between doctors and their patients . . . ."

In *Estate of Green v St Clair Co Rd Comm,* 175 Mich App 478, 489; 438 NW2d 630 (1989), the Court considered whether an autopsy fit within the privilege in the context of a wrongful death action. The Court stated:

> It is very clear to us that the performing of an autopsy on, and the withdrawing of blood from, Mr. Green's body were not actions discharged by the county medical examiner while attending Mr. Green as a patient or for the purpose of treatment, advice or surgery. No physician-patient relationship arose because, at the time Dr. Kopp performed the medical acts, Mr. Green was not alive. "No physician-patient relationship arose; therefore, no physician-patient privilege existed." *Osborn v Fabatz,* 105 Mich App 450, 456; 306 NW2d 319 (1981).

We agree. The purpose of the privilege is to protect the doctor-patient relationship and insure that communications between the two are confi-

dential. Since there is no communication in an autopsy, applying the privilege to the autopsy situation would not further the purpose of the act. Furthermore, the privilege provides that information is protected which is *"necessary* to enable the person to *prescribe* for the patient as a physician, or to do any act for the patient as a *surgeon."* (Emphasis added.) Certainly, when a doctor performs an autopsy, the doctor is not prescribing treatment for the deceased; nor is the doctor performing surgery. Information acquired in the performance of an autopsy falls outside the scope of the privilege.

## VI. EVIDENTIARY HEARING

We are also asked to decide whether the trial court properly ruled that no evidentiary hearing was required. We are not persuaded that the trial court erred in refusing an evidentiary hearing.

Defendant's essential argument is that since he has the burden of proving that the exemption applies, he should be allowed to establish a record. Defendant also argues:

> However, by denying Defendant an evidentiary hearing, Defendant has had to rely on each court to use its discretionary power to allow pleadings which contain descriptions of the autopsy procedure, and which describe the contents of a medical examiner's file. Not only was Defendant denied the opportunity in this case to cross-examine Plaintiff's affiant, but also the Plaintiff was denied the opportunity to cross-examine Defendant, whose testimony was admitted by written statement in the trial court.

Apparently, the only witness that defendant would have offered was himself. However, the trial

court had the parties stipulate with regard to the substance of the defendant's proposed testimony, and the stipulation was entered on the record. Therefore, defendant was permitted his offer of proof. On the basis of the undisputed facts, the trial judge could ascertain no factual development which would satisfy defendant's burden. We agree with the trial court that the record was sufficient to make a ruling without a formal evidentiary hearing.

We also agree with the Court of Appeals that defendant's arguments that § 13(1)(m) exempts disclosure and that the FOIA violates the Equal Protection Clause were not decided by the trial court; therefore, the arguments are not preserved for appeal. *Joe Dwyer, Inc v Jaguar Cars, Inc,* 167 Mich App 672, 685; 423 NW2d 311 (1988).

### VII. CONCLUSION

In summary, we find that disclosure of the autopsy report and toxicology test results would not amount to a "clearly unwarranted invasion of privacy" of the late Judge Quinn or his family under § 13(1)(a) of the FOIA. Furthermore, we find that the physician-patient privilege is inapplicable to the facts of this case. Thus, § 13(1)(a) and § 13(1)(i) do not exempt the documents from disclosure. Finally, we also hold that there was no need for an evidentiary hearing in the trial court. Accordingly, we affirm the decision of the Court of Appeals.

CAVANAGH, C.J., and BRICKLEY and BOYLE, JJ., concurred with RILEY, J.

GRIFFIN, J., concurred in the result only.

LEVIN, J. (*separate opinion*). The question is

whether a county medical examiner may withhold copies of an autopsy report and toxicology test results requested under the Freedom of Information Act on the ground that disclosure would constitute a "*clearly unwarranted* invasion of an individual's privacy" or an "*unwarranted* invasion of personal privacy."[1]

I would hold that the family of a deceased

---

[1] The Freedom of Information Act provides:

(1) A public body may exempt from disclosure as a public record under this act:

(a) Information of a personal nature where the public disclosure of the information would constitute *a clearly unwarranted invasion of an individual's privacy.*

(b) *Investigating records compiled for law enforcement purposes,* but only to the extent that disclosure as a public record would do any of the following:

* * *

(iii) Constitute *an unwarranted invasion of personal privacy.* [MCL 15.243(1); MSA 4.1801(13)(1). Emphasis added.]

It is unclear whether there is a real or intended difference between a "*clearly unwarranted* invasion of an *individual's* privacy" and an "*unwarranted* invasion of *personal* privacy." Arguably, the second privacy exemption may be justified on less evidence of invasion of privacy than the first. Further, the second exemption may relate to invasion of the privacy of "persons" other than the "individual" who is the subject of the requested records. Conversely, it may be that the first exemption permits withholding disclosure where the "[i]nformation [is] of a personal nature" in respect to any "individual," whether or not the subject of a requested record. I would reach the same conclusion on the basis of either of these provisions.

In construing the federal Freedom of Information Act (5 USC 552), the United States Court of Appeals for the District of Columbia Circuit said: "Unlike exemption 6, which permits nondisclosure only when a document portends a 'clearly unwarranted invasion of personal privacy,' exemption 7(C) does not require a balance tilted emphatically in favor of disclosure." *Bast v United States Dep't of Justice,* 214 US App DC 433, 436; 665 F2d 1251 (1981). Exemption 6 of the federal FOIA corresponds to § 13(1)(a), and exemption 7(C) corresponds to § 13(1)(b)(iii) of the Michigan FOIA, although there are language differences that are arguably significant.

Similarly, see *Congressional News Syndicate v United States Dep't of Justice,* 438 F Supp 538, 541 (D DC, 1977). (The difference is attributable to the inherent distinctions between investigatory files and "personnel, medical, and similar files.")

person has a privacy interest in an autopsy report and toxicology test results, that such a report and test results contain "[i]nformation of a personal nature," and that the Wayne County Medical Examiner has sustained the burden of demonstrating that disclosure would constitute a clearly unwarranted invasion of the personal privacy of Judge Quinn's family.

In part III, I conclude, primarily on the basis of the analysis of the United States Supreme Court in *United States Dep't of Justice v Reporters Committee for Freedom of the Press,* 489 US 749, 773; 109 S Ct 1468; 103 L Ed 2d 774 (1989), that in applying an FOIA privacy exemption, a court should balance the interests in disclosure and nondisclosure, and that disclosure generally cannot be justified if it would reveal "little or nothing" about, or fail to shed "any light on the conduct of any Government agency or official."[2]

I explain

—In part IV, why I conclude that an autopsy report and toxicology test results prepared and obtained by a county medical examiner are "[i]nvestigating records compiled for law enforcement purposes";[3]

—In part V, why I conclude that an autopsy report and toxicology test results are "[i]nformation of a personal nature," and the family

---

[2] All FOIA information requests need not further the core purpose of the FOIA. See *Int'l Union, United Plant Guard Workers of America v Dep't of State Police,* 422 Mich 432, 441; 373 NW2d 713 (1985). (LEVIN, J.) Some of the exemptions are in terms absolute. The privacy exemptions, because they require a court to distinguish between warranted and unwarranted disclosures, require a balancing of the public and privacy interests and thus consideration of the core purpose of the FOIA.

[3] See n 1.

of a deceased person has an "individual privacy" and a "personal privacy"[4] interest in an autopsy report and toxicology test results;

—In part VI, why I conclude that disclosure of an autopsy report and toxicology test results concerning a private citizen would generally reveal little or nothing about, nor shed any light on, the conduct of a government agency or official, and why I reach the same conclusion, on the record here presented, respecting an autopsy report and toxicology test results concerning Judge Quinn, an elected public official.

There is no suggestion that Judge Quinn was guilty of misconduct in office. There is a hint, based solely on the discovery of narcotics paraphernalia in the home of his mother, where he was house-sitting at the time of his death, that he possibly was guilty of personal misconduct, the use of a prohibited substance in violation of law, at the time of his death, found by the medical examiner to have been caused by a self-inflicted gunshot wound. A different question would be presented if Judge Quinn were still occupying public office, or might have again sought election to public office.

I

The majority's analysis, despite disclaimers, essentially equates common-law and constitutional privacy rights with the rights of privacy statutorily protected under the FOIA. The majority holds that disclosure is required solely on the basis of common-law and constitutional doctrines, and does not recognize any other privacy interest that was

---

[4] *Id.*

not protected at common law or by the constitution.

The majority determines first, that Judge Quinn's family could not maintain a common-law damage action for invasion of privacy if the autopsy report and test results were made public, and, second, because the constitutional right of privacy is personal to the decedent, any such right expired along with Judge Quinn and may not be asserted by his family. The majority concludes that because "no 'invasion of privacy' is threatened, we need not address whether an invasion was 'clearly unwarranted.' "[5]

The invasion-of-privacy exemptions should not be construed as including only those privacy rights cognizable at common law or protected by the constitution. By imposing on the privacy interests protected under the FOIA limitations in common-law and constitutional privacy doctrines, the majority has implicated the FOIA privacy rights of living persons as well as those of deceased persons and of the families of deceased persons.

The United States Supreme Court provided greater protection of privacy rights of living and deceased persons when it recently said that the "question of the statutory meaning of privacy under the [federal] FOIA *is, of course, not the same* as the question whether a tort action might lie for invasion of privacy or the question whether an individual's interest in privacy is protected by the Constitution."[6] *Reporters Committee, supra,* p 762, n 13. (Emphasis added.)

---

[5] *Ante, p 558.*

[6] The United States Court of Appeals for the Seventh Circuit said:

Although the common law doctrine of privacy may assist analysis, the privacy exemption under FOIA is not designed to prevent what would be tortious at common law. Congres[s] intended that the privacy interest protected under FOIA *extend beyond the common law.* [*Marzen v Dep't of Health & Human Services,* 825 F2d 1148, 1152 (CA 7, 1987). Emphasis added.]

Judicial understanding of privacy under the FOIA may be informed by law applicable in non-FOIA actions, but these several privacy interests are not coextensive. In particular, although a decedent's family may not be able to maintain a common-law action for disclosure of the results of an autopsy or toxicology analysis, that does not resolve the question whether the Wayne County Medical Examiner may exempt from disclosure an autopsy or toxicology analysis because disclosure would constitute an unwarranted invasion of the individual and personal privacy of the decedent's family.[7] The majority unduly focuses on whether

While the majority cites prior decisions of this Court suggesting that reference to common-law principles may be helpful in resolving claims of exemption under FOIA privacy provisions, RILEY, J., *ante,* p 546, this Court has not asserted that such provisions should be read to *compel* disclosure unless an objecting party could prevail in a damage action for invasion of privacy. Indeed, the passages quoted by the majority emphasize the need to "scrutin[ize] the particular facts of each case, *to identify those in which ordinarily impersonal information takes on 'an intensely personal character' justifying nondisclosure under the privacy exemption."* State Employees Ass'n v Dep't of Management & Budget,* 428 Mich 104, 123; 404 NW2d 606 (1987) (CAVANAGH, J.). (Emphasis added.) The details of an autopsy report, unlike the list of names and addresses at issue in *State Employees,* are surely not "impersonal information" in the first instance. Even if such intimate details could be so characterized, however, their revelation should not be compelled by mechanical application of tort law in the FOIA context.

[7] The rationale underlying the majority's tort analysis is qualitatively different from the purpose of the FOIA's disclosure exemption. The majority cites *Smith v City of Artesia,* 108 NM 339; 772 P2d 373 (1989), *ante,* p 553, for the view that "judicial concerns about framing the scope of the tort and its possible misuse, as well as traditional reluctance to permit *damages that are solely emotional,* have outweighed natural revulsion to abuse of the dead." *Smith* at 341 (emphasis added). *Smith* cites anno: *Invasion of privacy by publication dealing with one other than plaintiff,* 18 ALR3d 873, 874-875, which characterizes the tort cases as follows: "The question arises most frequently when relatives of a deceased person attempt to *recover for the injury done to their feelings* by the publication of a newspaper or magazine article dealing with the decedent." (Emphasis added.) The majority also cites *Cordell v Detective Publications, Inc,* 419 F2d 989, 992 (CA 6, 1969), RILEY, J., *ante,* pp 552-553, which explained "the

there is a tort remedy or a constitutionally protected right.

II

The FOIA is, indeed, a prodisclosure statute. It requires that all records compiled or maintained by a "public body" be made available unless the record is within an enumerated exemption.[8] Where an enumerated exemption is relied on, the court must determine the matter de novo, and the public body asserting the exemption has the burden of sustaining the applicability of the asserted exemption.[9]

A person making an FOIA request ordinarily need not state a reason for requesting particular material. Justices of this Court have said that neither the identity of the person making a request nor the purpose for which a record is sought is relevant to a determination whether disclosure of a particular record would constitute an unwarranted invasion of privacy.[10]

---

policy behind the rule," *id.*, p 552, as follows: "'The law is not unwisely wary of *actions for injury which is purely emotional;* the danger of spurious claims is too great.'"

In a tort case, there have been disclosure and publication, and the policy issue for the courts is whether there should be a common-law damage remedy. In an FOIA case, the question is whether an agency is justified, consistent with the legislatively declared public policy, in withholding from disclosure and, hence, publication, subject matter that otherwise presumably would not be published.

[8] MCL 15.233(1); MSA 4.1801(3)(1).

[9] MCL 15.240(1); MSA 4.1801(10)(1).

[10] In ordinary circumstances, inquiry into the identity of a requesting party or the purpose of a particular request will ultimately be pointless because, under the FOIA's prodisclosure policy, material once released becomes available to any other person who asks for it. See *Kestenbaum v Michigan State Univ*, 414 Mich 510, 528; 327 NW2d 783 (1982) (FITZGERALD, J.). When a court grants de novo review of a request, however, more narrowly constrained release is possible, and some courts have held that the particular public-interest purpose upon which disclosure is predicated may be balanced against the nature of the record sought. *Id.*, pp 528-529.

The United States Supreme Court has similarly said that "whether an invasion of privacy is *warranted* cannot turn on the purposes for which the request for information is made" (emphasis in original), that, generally, "the identity of the requesting party has no bearing on the merits of his or her FOIA request," and that, accordingly, the *rights of the news media*[11] *"are no different from those that might be asserted by any other third party,* such as a neighbor or prospective employer" (emphasis added). The Court quoted with approval Professor Davis' explanation: " 'The Act's sole concern is with what must be made public or not made public.' " *Reporters Committee, supra,* pp 771, 772. See Davis, *The information act: A preliminary analysis,* 34 U Chi L R 761, 765 (1966-67).

### III

In addressing FOIA requests claimed to be within a privacy exemption, the justices of this Court have disagreed whether such requests are to be evaluated without regard to the act's "core purpose,"[12] and whether it is appropriate to balance the "public interest" in disclosure against the "individual's right of privacy."[13]

### A

No opinion signed by four justices has ruled that the core purpose of the FOIA, the balance of inter-

---

[11] As stated by the Court, "the rights of the two press respondents in this case . . . ." *Reporters Committee, supra,* p 771.

[12] *UPGWA,* n 2 *supra,* p 441; *Kestenbaum,* n 10 *supra.*

[13] *State Employees Ass'n v Dep't of Management & Budget,* n 6 *supra.*

An apparently substantively similar form of balancing is expressly called for in the language of certain exemptions other than the privacy exemption. MCL 15.243(1)(c), (l), (n), (o), and (t); MSA 4.1801(13)(1)(c), (l), (n), (o), and (t).

ests in disclosure and nondisclosure, and the use to which the disclosed materials may be put, are always irrelevant to analysis of a privacy-exemption claim.[14] Absent an opinion signed by a majority so ruling, there has not been "an authoritative interpretation binding on this Court under the doctrine of *stare decisis.*"[15]

In *State Employees Ass'n v Dep't of Management & Budget,* 428 Mich 104; 404 NW2d 606 (1987), a majority was indeed in agreement that the names and home addresses of certain civil service employees were not exempt from disclosure

---

[14] In *UPGWA,* n 2 *supra,* pp 439-440, I observed that this Court had not decided, in *Kestenbaum,* n 10 *supra,* p 327, "whether, in determining if an invasion of privacy is 'clearly unwarranted,' a court should measure only the nature and extent of the asserted invasion of privacy or should balance the benefits of disclosure against the intrusion on privacy."

While "[b]oth opinions in *Kestenbaum* employed the balancing test articulated, in dictum, by the United States Supreme Court in *Dep't of the Air Force v Rose,* 425 US 352, 372-373; 96 S Ct 1592; 48 L Ed 2d 11 (1976)," *Kestenbaum* was not "binding under the doctrine of stare decisis because this Court was there evenly divided, and did not constitute an adoption of a balancing test." *UPGWA,* n 2 *supra,* p 439. In *UPGWA,* the Court was again evenly divided; the decision of the Court of Appeals affirming a decision of the circuit court ordering the disclosure of the names and addresses of security guards employed by certain security guard agencies was affirmed by equal division.

[15] Plurality decisions in which no majority of the justices participating agree as to the reasoning are not an authoritative interpretation binding on this Court under the doctrine of *stare decisis.* [*Negri v Slotkin,* 397 Mich 105, 109; 244 NW2d 98 (1976).]

    The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases. If there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties. [*People v Anderson,* 389 Mich 155, 170; 205 NW2d 461 (1973).]

    Similarly, see *Dean v Chrysler Corp,* 434 Mich 655; 455 NW2d 699 (1990); *People v Beach,* 429 Mich 450, 475, n 10; 418 NW2d 861 (1988); *People v Mitchell,* 428 Mich 364; 408 NW2d 798 (1987).

under the FOIA; but, again, a majority did not sign one opinion. Accordingly, the several opinions of the justices in *State Employees Ass'n,* like the several opinions in the earlier cases of *Kestenbaum v Michigan State Univ,* 414 Mich 510; 327 NW2d 783 (1982), and *Int'l Union, United Plant Guard Workers of America v Dep't of State Police,* 422 Mich 432, 439; 373 NW2d 713 (1985), are not binding under the doctrine of stare decisis.

**B**

The lead opinions in *UPGWA* and in *State Employees Ass'n* noted the uncertainty whether the United States Supreme Court, in *Dep't of the Air Force v Rose,* 425 US 352; 96 S Ct 1592; 48 L Ed 2d 11 (1976), had mandated a balancing test.[16]

In *Reporters Committee,* the United States Supreme Court put to rest the uncertainty regarding the meaning of *Rose.* In an opinion signed by seven justices, the Court read *Rose* as articulating a balancing test for the federal privacy exemption set forth in § 7(C), which corresponds to the Michigan FOIA exemption § 13(1)(b)(iii):

> [W]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Department of Air Force v Rose,* 425 US at 372, rather than on the particular purpose for which the document is being requested. [*Reporters Committee, supra,* p 772.]

[16] The signers of the lead opinion in *UPGWA* found it unnecessary to decide whether the balancing test, stated in dictum in *Rose,* was mandated by the federal or Michigan FOIA where a privacy exemption was invoked. In *State Employees Ass'n,* the signers of the lead opinion concluded that the Court had not mandated a balancing test in *Rose;* for this and other reasons, the signers of the lead opinion concluded that the Michigan FOIA does not provide a balancing test.

The other two justices, in a concurring opinion, agreed that, in applying the § 7(C) privacy exemption, a balancing test should be employed.[17]

The Court, in *Reporters Committee,* said that the policy of full agency disclosure unless information is exempted "*focuses* on the citizens' right to be informed about 'what their government is up to.' "[18] (Emphasis added.) The Court added:

—The statutory purpose is not fostered "by disclosure of information about private citizens that is accumulated in various governmental files but that *reveals little or nothing about an agency's own conduct.*"[19]

[17] The majority concluded, after balancing the interests involved, that the FBI could categorically exempt from disclosure a private citizen's record of arrests and convictions, without case-by-case balancing. The concurring justices favored case-by-case balancing, and were not convinced that a "categorical balancing" applicable to all such information was correct.

The majority said that ad hoc balancing was not required because "a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is 'unwarranted.' " *Id.,* p 780.

The Court said that in such a case, the FBI could categorically exempt from disclosure a private citizen's record, without case-by-case balancing:

The privacy interest in maintaining the practical obscurity of rap-sheet information will always be high. When the subject of such a rap sheet is a private citizen and when the information is in the Government's control as a compilation, rather than as a record of "what the Government is up to," the privacy interest protected by Exemption 7(C) is in fact at its apex while the FOIA-based public interest in disclosure is at its nadir. See Parts IV and V, *supra.* Such a disparity on the scales of justice holds for a class of cases without regard to individual circumstances; the standard virtues of bright-line rules are thus present, and the difficulties attendant to ad hoc adjudication may be avoided. [*Id.,* p 780.]

[18] *Id.,* p 773.

[19] *Id.* (Emphasis added.)

—Responding to a media request for the disclosure of a private citizen's FBI "rap sheet" "would not shed any light on the *conduct of any Government agency or official.*"[20]

—While the "rap sheet would provide details to include in a news story," that "is not the kind of public interest for which Congress enacted the FOIA. In other words, *although there is undoubtedly some public interest in anyone's criminal history* [emphasis added], especially if the history is in some way related to the subject's dealing with a public official or agency, the FOIA's central purpose is to ensure that the *Government's* [emphasis in original] activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* [emphasis in original] that happens to be in the warehouse of the Government be so disclosed."[21]

—"[I]n *none of our cases* construing the FOIA have we found it appropriate to order a Government agency to honor a[n] FOIA request for information about a *particular private citizen.*" (Emphasis added.)[22]

The FOIA provides that an invasion of privacy giving rise to *either* of the privacy exemptions delineated in § 13(1)(a) or (b)[23] must be "unwarranted."[24] An assessment whether an asserted invasion of privacy is "unwarranted," or "clearly

[20] *Id.* (Emphasis added.)
[21] *Id.,* p 774.
[22] *Id.,* pp 774-775.
[23] See n 1 for text.
[24] See n 1.

warranted," implicates what is "warranted." "[T]he *specific reference to an 'unwarranted' invasion* of privacy" indicates that "*a court must balance* the public interest in disclosure against the interest"[25] the Legislature intended the exemption to protect.

A determination whether an invasion of privacy is "warranted" will generally require an inquiry into the potential[26] justification for the request—warranted or not. The qualifying phrase "unwarranted" would become meaningless if the justification for disclosure, or a court's de novo[27] view of the public interest in disclosure, was of no consequence, for if that were so—if any justification were really as good as any other—invasion of privacy would always be warranted. To so conclude would clearly be contrary to the public policy, expressed in the FOIA, that at least some invasions of privacy are "unwarranted."

I conclude, on the basis of the structure and language of the FOIA and the analysis of the United States Supreme Court in *Reporters Committee,* that a circuit court, in making its determination of the merits de novo of an asserted privacy exemption, must balance the interests in disclosure and nondisclosure. In assessing the interest in disclosure, the focus is on the "citizens' right to be informed about 'what their government is up to.' "[28] Disclosure generally cannot be justified if it

---

[25] *Reporters Committee, supra,* p 776 (emphasis added).

[26] The justification asserted by the requester is not controlling. See *Reporters Committee, supra,* p 772, quoted in text immediately preceding n 17.

[27] In *Reporters Committee, supra,* p 776, the Court said that the requirement that the court "shall determine the matter de novo"—set forth in Michigan FOIA § 10(1), n 9 *supra*—and the "specific reference to an 'unwarranted' invasion of privacy" indicated that "a court must balance the public interest in disclosure against the interest Congress intended the exemption to protect."

[28] *Reporters Committee, supra,* p 773.

would reveal "little or nothing" about, or fail to shed "any light on the conduct of any Government agency or official."

Public curiosity does not equate with "the kind of public interest for which Congress [and the Legislature] enacted the FOIA." While there "is undoubtedly some public interest in anyone's criminal history [or autopsy report and toxicology test results], especially if the history is in some way related to" a public official, "the FOIA's central purpose is to ensure that the *Government's* activities be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government" be disclosed.[29] (Emphasis in original.)

IV

Before addressing the questions whether Judge Quinn's family has a privacy interest protected under the FOIA, and whether, if so, a different assessment of the balance of the public and privacy interests is justified or mandated because he was the Chief Judge of the 36th District Court, I first address the question whether an autopsy report and toxicology test results prepared and obtained by a county medical examiner are "[i]nvestigating records compiled for law enforcement purposes."[30]

I acknowledge that the medical examiner relied on the § 13(1) general privacy exemption, and not on the § 13(1)(b)(iii) privacy exemption for investigating records compiled for law enforcement purposes. This is not, however, private litigation. An issue of public importance affecting the citizenry at large is being decided. The privacy exemption

[29] *Id.,* p 774.
[30] See n 1.

for investigating records compiled for law enforcement purposes is clearly involved.

This Court, in *Lipiec v Zawadzki,* 346 Mich 197, 201; 77 NW2d 763 (1956), held that when the Legislature, by the enactment of 1953 PA 181,[31] created the office of county medical examiner, abolished the office of coroner, and transferred the duties of the coroner to the medical examiner,[32] it did not transfer to the medical examiner "inquisitional powers distinguished from investigative authority," and that "the act consequently extends investigative power only" to the medical examiner. The Court observed parenthetically, and relevantly to the present inquiry, that "[p]rosecuting attorneys and the attorney general are examples of officers having investigative but not inquisitorial powers and the county medical officer *now becomes another.*" 346 Mich 201, n *. (Emphasis added.)

Before the office of medical examiner was created by Act 181, inquests were conducted by justices of the peace[33] and coroners[34] "of such persons

[31] MCL 52.201 *et seq.;* MSA 5.953(1) *et seq.*

[32] In counties having a medical examiner under the provisions of this act, the powers and duties vested by law in the office of coroner are hereby transferred to and vested in the county medical examiners and their deputies. [MCL 52.213; MSA 5.953(13).]

[33] 1846 RS, Ch 167, §§ 1-11. These provisions were compiled with amendments as 1857 CL 6089 *et seq.;* 1871 CL 7970 *et seq.;* 1897 CL 11818 *et seq.;* 1915 CL 15645 *et seq.,* and reenacted as part of the Code of Criminal Procedure, 1927 PA 175, ch XIII, § 1 *et seq.,* compiled as 1929 CL 17403 *et seq.;* 1948 CL 773.1 *et seq.;* MSA 28.1169 *et seq.;* 1970 CL 773.1 *et seq.;* MSA 28.1169 *et seq.;* MCL 773.1 *et seq.;* MSA 28.1169 *et seq.*

[34] 1861 PA 88 provides that justices of the peace in incorporated cities in which a county coroner resides shall no longer hold inquests if the coroner is able to act, and that the coroner shall conduct inquests whenever, in his judgment, "an inquest shall be necessary," and that a coroner's jury shall consist of six persons. Also, that all provisions of law relating to holding inquests by justices of the peace

as shall have come to their death suddenly or by violence and of such persons as shall have died in prison."[35]

A county medical examiner was similarly authorized by Act 181 to investigate "the cause and manner of death in all cases of persons who have come to their death by violence; or whose death was unexpected; or without medical attendance during the 48 hours prior to the hour of death unless the attending physician, if any, is able to determine accurately the cause of

are made applicable to inquests held or to be held by a coroner, and that all powers conferred upon justices of the peace relative to such inquests are conferred on coroners. Further, any coroner holding such an inquest shall have the power to summon the attendance of a "competent surgeon, whenever he shall deem such attendance necessary; and a chemist may be employed in cases affording reasonable ground of suspicion that death has been produced by poison."

The provisions of Act 88 were compiled in 1871 CL 7981-7983; 1897 CL 11832, 11833; 1915 CL 15656-15658. The substance of Act 88, with amendments, was reenacted as part of the Code of Criminal Procedure, 1927 PA 175, ch XIII, §§ 12, 13; compiled as 1929 CL 17414, 17415; 1948 CL 773.12, 773.13; MSA 28.1165, 28.1166; 1970 CL 773.12, 773.13; MSA 28.1165, 28.1166; MCL 773.12, 773.13; MSA 28.1165, 28.1166.

Sections 12, 13 of Chapter XIII of the Code of Criminal Procedure were repealed by 1980 PA 506, which amended Chapter XIII to provide, among other things, that a magistrate, rather than a justice of the peace or coroner, shall hold an inquest, and to confer on the magistrate the power to require by subpoena the attendance of a competent physician or surgeon and to employ a chemist, if there is reasonable ground of suspicion that death has been produced by poison, to provide that a written transcript of the testimony at an inquest need not be prepared unless requested by the "prosecuting attorney, *medical examiner,* the magistrate, or a judge of the court in the judicial district in which the offense [murder, manslaughter, or assault] could be tried," and to provide and amend the form of the "inquisition of jury" regarding the findings if it appeared that the deceased "came to his or her death by unlawful means." MCL 773.6-773.8; MSA 28.1174-28.1176. (Emphasis added.)

[35] 1846 RS, Ch 167, § 1. See n 33 for subsequent compilations. This section was repealed by 1980 PA 506; § 1 of Chapter XIII of the Code of Criminal Procedure, now providing that a magistrate holding an inquest pursuant to 1953 PA 181, creating the office of medical examiner, shall follow the procedures prescribed in that chapter. MCL 773.1; MSA 28.1169.

death . . . ."[36] It thus appears that while the procedure for conducting autopsies has been successively streamlined, updated, and routinized, the fundamental nature and purpose of an autopsy and resulting report is unchanged from prior law.

The Attorney General recently ruled, on the basis of his readings of Act 181 creating the office of medical examiner and a provision of the Public Health Code prohibiting a physician from performing an autopsy without written permission of the person assuming custody of the body for purposes of burial,[37] that a medical examiner who has determined that an autopsy is not required by law is without statutory authority to perform an autopsy, even if requested to do so.[38]

Chapter XIII of the Code of Criminal Procedure, captioned "Proceedings for the Discovery of Crime," was amended in 1980 to eliminate the

[36] 1953 PA 181, as amended by 1969 PA 92, MCL 52.202; MSA 5.953(2). Section 2 further provides for examination where the death is "the result of an abortion, whether self-induced or otherwise," and that if any prisoner in a county or city jail "dies while so imprisoned, the county medical examiner" shall examine the body of the deceased prisoner.

[37] MCL 333.2855(1); MSA 14.15(2855)(1) provides:

An autopsy shall not be performed upon the body of a deceased individual except by a physician who has been granted written consent to perform the autopsy by whichever 1 of the following individuals assumes custody of the body for purposes of burial: parent, surviving spouse, guardian, or next of kin of the deceased individual or by an individual charged by law with the responsibility for burial of the body. If 2 or more of those individuals assume custody of the body, the consent of 1 is sufficient. This section shall not prevent the ordering of an autopsy by a medical examiner or a local health officer.

[38] OAG, 1991, No 6,696 (August 23, 1991).

The Attorney General relied in part on a decision of the Court of Appeals, *Burse v Wayne Co Medical Examiner,* 151 Mich App 761, 766; 391 NW2d 479 (1986), and on decisions of the Supreme Courts of Wisconsin and Vermont construing their statutes. *Scarpaci v Milwaukee Co,* 96 Wis 2d 663, 675-681; 292 NW2d 816 (1980); *State v Chambers,* 144 Vt 234, 239-240; 477 A2d 110 (1984).

power of a justice of the peace or of a coroner to conduct an inquest and to provide that a magistrate holding an inquest *pursuant to Act 181, creating the office of medical examiner, shall follow the procedures prescribed in Chapter XIII of the Code of Criminal Procedure.*[39]

It is apparent that the primary function of a medical examiner is to determine whether a person's death was the result of unlawful means, and that the sole reason for authorizing an autopsy and toxicology testing—as an exception to the public policy set forth in the Public Health Code[40] that the family of the deceased determines whether to have an autopsy, and thus whether to make public an autopsy report or toxicology test results—is to determine whether a criminal of-

---

[39] 1980 PA 506, amending MCL 773.1; MSA 28.1169.

Until the 1980 amendment, provision was made for conducting an inquest on the petition of not less than five citizens. 1846 RS, Ch 167, § 2. See n 33 for subsequent compilations. Act 181 provides that upon the written order of the prosecuting attorney or the Attorney General, or upon the filing of a petition signed by six electors of a county, the county medical examiner shall conduct an investigation of the circumstances surrounding any death believed to have occurred in the county. MCL 52.207; MSA 5.953(7). This provision was amended to provide that upon determination of the prosecuting attorney "*or upon the determination of the examiner* an inquest shall be held by a district court judge or a municipal court judge." 1968 PA 274; 1969 PA 92. (Emphasis added.)

Act 181 also provides that the county medical examiner may, in a case where an examination of the body of a deceased person is required, perform an autopsy and "shall carefully reduce or cause to be reduced to writing every fact and circumstance tending to show the condition of the body and the cause and manner of death, together with the names and addresses of any persons present at the autopsy . . . ." MCL 52.205(3); MSA 5.953(5)(3). This provision of Act 181 was subsequently amended, but the language quoted remains unchanged.

The act further provides that a medical examiner "shall keep a record of all views of bodies found dead, together with their view and autopsy reports," MCL 52.211; MSA 5.953(11), and that a medical examiner may be required to testify in behalf of the state "in any matter arising as the result of any investigation required" under the act. MCL 52.212; MSA 5.953(12). This provision of Act 181 also was subsequently amended, but the language quoted remains unchanged.

[40] See n 37.

fense was committed. Clearly, an autopsy report and toxicology test results, when prepared by a medical examiner, are "[i]nvestigating records compiled for law enforcement purposes."

## V

I turn to the question whether Judge Quinn's family has a privacy interest statutorily protected by the FOIA.

## A

The FOIA speaks, in the § 13(1)(a) general privacy exemption, of an "individual's privacy," and, in the § (13)(1)(b)(iii) privacy exemption for investigating records compiled for law enforcement purposes, of "personal privacy."[41] While "individual" and "personal" would, during the lifetime of an individual or person for whom a record has been compiled by a public body, refer to that individual or person, both phraseologies include, after the death of such person, in terms at least, the "individual" and "personal" privacy interests of the members of the family of a deceased person.

The privacy interests of the family of a deceased person have been recognized as protected by the federal FOIA.[42] In *Marzen v Dep't of Health &*

---

[41] See n 1.

[42] The majority states (*ante,* p 556) "that FOIA privacy rights expire with the holder of the rights." Citing *Diamond v FBI,* 532 F Supp 216, 227 (SD NY, 1981); *Rabbitt v Dep't of the Air Force,* 383 F Supp 1065, 1070 (SD NY, 1974); *United States v Schlette,* 842 F2d 1574, 1581 (CA 9, 1988).

In *Diamond,* a professor sought disclosure of documents relating to governmental surveillance of academicians, including himself, during the McCarthy era. The government invoked the law enforcement privacy exemption. The court stated that balancing was required. Some of the records sought were over thirty years old. The court observed that some of the persons who had been interviewed by the FBI were probably dead, "in which case their privacy interests are

*Human Services,* 825 F2d 1148, 1152, 1154 (CA 7, 1987), the United States Court of Appeals for the Seventh Circuit, observing that "the privacy interest protected under FOIA extend[s] beyond the common law," held that the agency could exempt from disclosure medical and other records of an infant born with Down syndrome and a blocked esophagus. The court said that, among other considerations, release of medical and related data "would almost certainly cause Infant Doe's parents more anguish . . . ."[43]

diminished . . . and the balance tips towards disclosure." *Id.,* p 226. The court did not say that the privacy interests expire at death. Instead, the court stated that the government could search its files to determine if the persons involved were still living, or if they "have expressed a desire that their involvement be disclosed." *Id.,* p 227.

In *Rabbitt,* an Air Force plane crashed, killing two persons and injuring a third. The estate of one of the deceased sought records. The government invoked the exemption for medical and personnel files. In ordering the release of the medical report, the court said that if the disclosure threatened the privacy of any individual, balancing was required, but in the particular case "we fail to perceive any invasion of privacy in releasing the medical report of the deceased ground crew member." *Id.,* p 1070.

In *Schlette,* a newspaper sought disclosure of a presentencing report of a felon who, upon his release from prison, killed the district attorney who obtained his conviction and then killed himself. The government refused to disclose on the basis that the reports were confidential court records.

The court stated, in ordering disclosure, "privacy concerns still may militate against disclosure in a given case. But when the defendant is dead, as in the present case, this ground for nondisclosure is foreclosed. . . . [Citations omitted.] *And there is no evidence in this case that the privacy interests of anyone other than the dead defendant may be implicated by disclosure of the contents of the presentence report and related documents." Id.* at 1581. (Emphasis added.)

[43] The court agreed with the district court that the person seeking disclosure had " 'not demonstrated adequately that any issue in the public policy debate turns on any information available in the medical records but not already disclosed to the public or that any withheld medical record would contribute to the public's oversight of [the Office for Civil Rights'] role in the matter.' " *Id.* at 1153.

Similarly, it does not appear that disclosure of the autopsy report or toxicology test results would contribute to the public's oversight of any government agency. Revelation that Judge Quinn had used illicit drugs shortly before his death would likely embarrass his family, yet add little to the already public knowledge that drug paraphernalia was found in his mother's home.

The United States Court of Appeals for the District of Columbia Circuit said that autopsy reports that would "shock the sensibilities of surviving kin" may be withheld, and remanded for case-by-case review of the autopsy reports of the victims of military aircraft accidents. *Badhwar v United States Dep't of the Air Force,* 264 US App DC 397, 401; 829 F2d 182 (1987). The court, in *Lesar v United States Dep't of Justice,* 204 US App DC 200, 214; 636 F2d 472 (1980), had earlier sustained the government's withholding of records pertaining to an FBI investigation of Dr. Martin Luther King, Jr., and the later investigation of his assassination. The excised materials included

> *information of a personal nature, the disclosure of which allegedly could embarrass Dr. King's family and associates or damage their reputations. . . .* [T]he district court sustained the exemption for these materials, finding that the privacy interest involved outweighed the public interest in disclosure. [Emphasis added.]

### B

The lustre that attaches to a good name benefits family members, and also other persons who happen to have the same name. The success of name candidates in judicial and other elections attests to the importance of a good name. Contrariwise, a blemish on a name detracts from the worth of the name, and may even render the name a liability. It would probably be a liability to be named Jesse James, John Dillinger, Adolph Hitler, or Josef Stalin. It would probably be an asset to be named John or Winston Churchill, Dwight Eisenhower, or Franklin Roosevelt, especially if one is a descendant.

It has been said that "[a] good name is rather to

be chosen than great riches . . . ."[44] Maintaining
the legacy of a good name is of considerable impor-
tance to one's heirs. The private and, not infre-
quently, public papers of prominent persons are
deposited in an archive on the understanding that
they will not be made public for over fifty years,
and thus until after the likely death of most
persons acquainted with the person whose papers
have been deposited.

Judge Longworth Quinn, Jr., no doubt benefited,
when he ran for judicial office, from the good
name of his father, Longworth Quinn, Sr., pub-
lisher of the Michigan Chronicle. An article pub-
lished over Swickard's byline shortly after Judge
Quinn died referred to Judge Quinn's lineage:
"Quinn, heir to one of the Detroit's most respected
names, was emerging as one of Detroit's leading
legal figures." Surely, any embarrassing informa-
tion provided by disclosure of the autopsy and test
results might detract from that good name, and
might thereby cause harm to individual members
of the Quinn family, who similarly are heirs to
that respected name.

Although in theory one should be judged only by
one's accomplishments and failures, descendants
and other family members will benefit and may be
harmed by what other family members do. The
aphorism, "the apple does not fall far from the
tree," reflects this shared experience.

On principle, therefore, as well as on the author-
ity of federal FOIA cases, *Marzen, Badhwar,* and
*Lesar,* and because the language of the FOIA ex-
emption includes, in terms at least, the individual
members of the family of a person for whom a
record has been compiled by a public agency, I
would hold that the individual members of the

44 Proverbs 22:1.

family of Judge Quinn have an individual and personal privacy interest protected by the privacy exemptions of the FOIA.

C

Swickard contends that the people's right of access to "public records" is a fundamental tenet of Michigan law, and relies on *Nowak v Auditor General,* 243 Mich 200; 219 NW 749 (1928),[45] and *Booth Newspapers, Inc v Muskegon Probate Judge,* 15 Mich App 203; 166 NW2d 546 (1968).[46] The reliance on these cases begs the question whether an autopsy report and toxicology test results were public records before the FOIA.

A person seeking disclosure pre-FOIA had the burden of establishing that he could maintain an action in mandamus, as in *Nowak,* or for superintending control, as in *Booth Newspapers.* Under the FOIA, the public body has the burden of justifying nondisclosure.[47] Swickard made an FOIA request. A different question might be presented if he had filed a separate pre-FOIA count in his complaint.

[45] In *Nowak,* the manager and editor of a newspaper was granted a writ of mandamus directed to the Auditor General to permit inspection of public records.

[46] The Court in *Booth Newspapers* said that the right of access was not absolute, and that the Legislature may restrict access "by providing definitions of 'public' as opposed to 'private' records." Further,

the courts may determine that the legislature intended to restrict access in cases *where harm to the public interest may be said to outweigh the right of members of the public to have access,* or . . . *where reputations may be harmed, or for pastime, whim or fancy.* [*Id.,* pp 207-208. Emphasis added.]

[47] Section 10(1) of the FOIA provides:

[T]he burden is on the public body to sustain its denial. [MCL 15.240(1); MSA 4.1801(10)(1).]

D

While not determinative, pre-FOIA law would be of some guidance in divining legislative intent regarding the scope of the privacy exemptions under the FOIA. Research has failed, however, to produce clearly authoritative evidence on the question whether autopsy reports and test results were public records in this state before the FOIA was enacted.[48]

Before the creation of the office of medical examiner, and thus pre-FOIA, autopsies were conducted, if at all, as part of an inquest. The justice of the peace or coroner conducting the inquest could, but was not required to, summon a physician to conduct an autopsy.[49] The inquiry, like a grand jury inquiry, was inquisitorial, not adversarial. Proceedings could be held in secret.

If the inquest jury found that "any murder, manslaughter or assault had been committed upon the deceased," the justice of the peace or coroner would return to the circuit court or Recorder's Court the "inquisition, to be called a coroner's inquest . . . ."[50] The jury's determination that murder, manslaughter, or an assault had been committed, like a grand jury presentment, could be kept secret until the culprit was apprehended and arraigned. The statutes do not state, however, whether any public report was to be made when the jury did not find that a crime had been committed. The parties have not provided any evidence regarding the practice before the office of medical examiner was created. The only evidence

---

[48] Death certificates are made public records by MCL 333.2882; MSA 14.15(2882). The Legislature has not so provided respecting autopsy reports.

[49] 1846 RS, Ch 167, § 4. See n 33 for subsequent compilations.

[50] 1846 RS, Ch 167, §§ 8, 9. See n 33 for subsequent compilations.

presented regarding medical examiner practice in that regard is an affidavit of a former Wayne County Medical Examiner stating that it was his practice to disclose autopsy reports and test results.

In *In re Midland Publishing Co, Inc,* 420 Mich 148, 173; 362 NW2d 580 (1984), this Court held that a court file containing the name of a victim of criminal sexual conduct, the name of the defendant, and the details of the offense could be suppressed until the defendant was arraigned, and observed that the public's right of access to a *criminal trial* did not extend to preliminary examinations:

> [I]t is clear that the public enjoyed no common-law right of access to proceedings undertaken to determine probable cause. Indeed, no case authority or scholarly writings can be found to suggest otherwise. Rather, that which can be gleaned from history indicates that proceedings leading to a person's indictment were not open to the public. See, generally, *Gannett [Co, Inc v DePasquale,* 443 US 368, 395; 99 S Ct 2898; 61 L Ed 2d 608 (1979)] (Burger, C.J., concurring), p 437 (Blackmun, J., dissenting) . . . .[24]

---

[24] "The fact that such proceedings might have been held in private at common law in England or in this country does not detract from my conclusion that pretrial suppression hearings should not be, any more than does the fact that grand juries— or preliminary proceedings *such as coroner's inquests at common law*—were and are secret." *Gannett, supra,* p 437 (Blackmun, J., dissenting).

---

[Emphasis added.]

A few weeks before the Governor signed the law creating the office of medical examiner in 1953, he

signed a law that recognized that the family of a deceased person may refuse to have an autopsy,[51] and thus has the power to prevent disclosure of autopsy and test results unless the circumstances of the death were such that the medical examiner was empowered by law to conduct an autopsy. The Legislature thereby in effect recognized a privacy right in the family to prevent disclosure of autopsy and toxicology test results in ordinary circumstances.

The 1953 legislation could, indeed, be read as eliminating the power of the family to prevent disclosure of autopsy and toxicology test results where the circumstances are not ordinary and the medical examiner performs an autopsy. I would, however, read the 1953 legislation creating the office of medical examiner and recognizing the privacy interests of the family as creating a narrow exception for purposes of law enforcement, and as shielding from public view pre-FOIA autopsy and test results except where it is found that the death was a result of "any murder, manslaughter or assault." I so conclude because the only reason for authorizing a medical examiner to conduct an autopsy is to determine whether the death was a result of unlawful means, and because, until the office of medical examiner was created, autopsies were conducted, if at all, only as part of a secret inquisitorial proceeding.

Be that as it may, under the FOIA, autopsy reports and toxicology test results, like all other records compiled by a public body, are, to be sure, subject to disclosure unless the agency may withhold such reports and results under one of the exemptions.

---

[51] 1953 PA 95, MCL 328.151; MSA 14.524. See n 37 for current provisions.

E

The majority does not address the contention of
the medical examiner and the intervenor that
autopsy reports and toxicology test results are also
subject to the FOIA exemption for medical records:

(1) A public body may exempt from disclosure as
a public record under this act:

*    *    *

(m) Medical, counseling, or psychological facts
or evaluations concerning an individual if the
individual's identity would be revealed by a disclo-
sure of those facts or evaluation. [MCL 15.243(1)(m);
MSA 4.1801(13)(1)(m).]

The Court of Appeals said that the medical
examiner had failed to preserve this issue for
appeal, and declined to consider the argument on
the merits.[52]

The Supreme Judicial Court of Massachusetts,
in *Globe Newspaper Co v Chief Medical Examiner,*
404 Mass 132, 135; 533 NE2d 1356 (1989), found
that autopsy reports concerning suicide victims
were " 'medical files or information' "[53] exempt
from disclosure under the Massachusetts FOIA. The
court noted the "strong public policy in Massachu-

[52] 184 Mich App 662, 668; 459 NW2d 92 (1990).

[53] The text of the exemption, as set forth in the opinion of the court,
is as follows:

"[M]edical files or information; also any other materials or
data relating to a specifically named individual, the disclosure
of which may constitute an unwarranted invasion of personal
privacy." [*Globe, supra,* p 134.]

See text immediately preceding n 52, for text of the Michigan FOIA
medical exemption, and n 1, § 13(1)(a) for the text of the general
Michigan FOIA exemption for information of a "personal nature"
where public disclosure would constitute "a clearly unwarranted
invasion of an individual's privacy."

setts that favors confidentiality as to medical data about a person's body," citing laws governing hospital records, AIDS testing, and reports or records of venereal disease, Reye's syndrome, and infectious diseases:

> Autopsies performed by physicians are diagnostic in nature and yield detailed, intimate information about the subject's body and medical condition. Therefore, they are medical records. [*Globe, supra,* p 134.]

*Globe* recognized that medical diagnostic records are generally protected from public scrutiny by various provisions of law designed to protect personal privacy.[54] To require the production of autopsy or test results, except in the context of a criminal proceeding, would be contrary to the spirit of the statutes which generally shield such information from public view.

### VI

Having determined that the individual members of Judge Quinn's family have a privacy interest protected by the FOIA privacy exemptions, I next consider whether the public interest in disclosure outweighs the privacy interest. I first consider whether, if Judge Quinn were a private citizen and

---

[54] See MCL 600.2157; MSA 27A.2157 (physician-patient privilege); MCL 330.1750; MSA 14.800(750) (psychiatrist/psychologist-patient privilege); MCL 333.20175; MSA 14.15(20175) (health facility or agency [includes hospitals]-patient privilege); MCL 333.6111; MSA 14.15(6111) (patient records of licensed substance abuse treatment and rehabilitation service, licensed prevention service, approved service program, or emergency medical service); MCL 333.6521; MSA 14.15(6521) (patient records of approved service program or emergency medical service); MCL 330.1748; MSA 14.800(748) (records of recipient of mental health services from facility or entity licensed by state or operated by or under contract with public agency); MCL 333.2631, 333.2632; MSA 14.15(2631), 14.15(2632) (medical research projects).

not formerly a public official, the privacy interest of his family would outweigh the public interest. I conclude that the privacy interest of the family of a private citizen outweighs the interest in disclosure.

In this connection, it is noteworthy that Judge Quinn was no longer a public official when the autopsy was conducted, or when the autopsy report was prepared and the toxicology test results were received; arguably, in applying the private citizen/public official dichotomy, recognized in FOIA cases, he should, after his death, be regarded as closer to a private citizen than a public official. I nevertheless secondly consider whether a different assessment of the balance between the public interest in disclosure and the privacy interest is required because Judge Quinn was formerly an elected public official.

A

The privacy interest in an autopsy report and in toxicology test results, and the privacy interest in records of arrests and convictions, respecting a private person appear to be much the same in that an autopsy report and toxicology test results, like a record of arrests and convictions, is not a record of " 'what the Government is up to,' " with the result that the privacy interest of the family of a private citizen "is in fact at its apex while the FOIA-based public interest in disclosure is at its nadir."[55]

Had Judge Quinn been a private citizen, the reports at issue clearly would be exempt from disclosure under the United States Supreme Court's analysis of the law-enforcement-records exemption, *Reporters Committee, supra.* A third-

---

[55] *Reporters Committee, supra,* p 780. See n 17.

party request for this information, like the request for records of arrests and convictions in *Reporters Committee,* could reasonably be expected to invade the privacy of the subject of the records or, in this case, of his immediate family. Further, in the absence of a tenable claim that release of the records would somehow assist the public in learning "what their Government was up to," the invasion of privacy would clearly be "unwarranted."

The identity of a requesting party is not relevant to privacy-exemption analysis. "Either all requestors have access, or none do. The special needs of one, or the lesser needs of another, do not matter." *United States Dep't of the Air Force v Federal Labor Relations Authority,* 838 F2d 229, 233 (CA 7, 1988). The balancing of interests in disclosure and nondisclosure must therefore "be conducted at a more general level. Do the several uses to which many people would put the information justify its release? And the dispositive inquiry is whether there *are* legitimate uses, not whether we think them noble or tacky." *Id.* (Emphasis added.) Legitimate uses are those that comport with the underlying policy of the FOIA.

The United States Court of Appeals for the Seventh Circuit concluded, in the cited case, that the home addresses of employees not represented by a union that represented some civilian employees at an Air Force base were not exempt from disclosure, a conclusion similar to that reached by this Court when it ordered the disclosure of names and addresses of students at a state university in *Kestenbaum,* security guards in *UPGWA,* and civil service employees in *State Employees Ass'n.* In the instant case, in contrast with *Kestenbaum, UPGWA,* and *State Employees Ass'n,* information that might stigmatize the memory of a particular person, and affect the privacy interest of a particu-

lar family, is being sought, not information respecting hundreds or thousands of persons that carries no stigma respecting a particular person.

The "uses" of an autopsy report may well include "publications concerning . . . suicides . . . and many other similar matters of genuine, even if more or less deplorable, popular appeal" without running afoul of *tort* law.[56] This is so because tort doctrine, which generally denies relief to the next of kin *after* such publication, reflects concern that relatives might play on the sympathies of a jury to exact payment from the publisher of a news story about the deceased even when the deceased is the subject of legitimate public concern.

The policy in protecting news media from common-law damage actions brought by members of a decedent's family does not, however, support requiring FOIA release of intimate personal information about a decedent "merely [because it is found in] records that the Government happens to be storing . . . ." *Reporters Committee, supra,* p 780.

The balancing required by the FOIA, unlike the tort-based "legitimate public concern" balancing conducted by the majority, requires weighing " 'the public's right to know [against] the private citizen's right to be secure in his personal affairs which have no bearing or effect on the general public.' "[57] Individual autopsy reports, like individual records of arrests and convictions, "tell us nothing about matters of substantive law enforcement policy that are properly the subject of public concern."[58]

---

[56] 3 Restatement Torts, 2d, § 652D, comment g, pp 390-391, cited *ante,* pp 550-551.

[57] *Reporters Committee, supra,* p 766, n 18.

[58] *Id.*

B

During his life Judge Quinn held elective office and therefore may have had a lesser expectation of personal privacy than would a private citizen. His governmental post may also have affected his family's privacy right during his life.

The United States Court of Appeals for the District of Columbia Circuit rejected, however, the argument that "the privacy rights of public employees are limited by the right of the public to monitor its government." The court said that it was well established "that government officials do not surrender all rights to personal privacy when they accept a public appointment." The court added that while a person's official position may enter the balance in determining whether the law enforcement records exception was properly invoked, "it does not determine, of its own accord, that the privacy interest is outweighed." *Bast v United States Dep't of Justice,* 214 US App DC 433, 436, 437; 665 F2d 1251 (1981).

Bast had charged that a United States District Judge and a secretary had improperly induced a court reporter to delete a discussion between Bast and the judge from a transcript. The Justice Department and the FBI investigated the complaint, but brought no charges. Bast then filed an FOIA request. The United States Court of Appeals examined in camera each of the documents, and concluded that "the privacy interest far outweighs the incremental benefit to the public," with the exception of one document that "could be interpreted to indicate that the judge was biased in favor of the government and the FBI." *Id.,* p 437. While the remarks attributed to the judge might have been "designed to reassure the agents that the judge had not been offended by their previous questions

or procedures," the court ordered disclosure of a three-sentence passage, stating:

> [E]ven the possibility that Judge Pratt could have intended to reveal a bias raises a significant issue of public concern. Judicial impartiality is essential to the integrity of the nation's courts. If the agent incorrectly attributed the comment to the judge, or if the comment was intended to assuage feelings rather than to influence the investigation, that must be explained. It cannot be assumed. The public importance of judicial impartiality outweighs the privacy interest in this case. [*Id.*, pp 437-438.]

Bast was a private investigator with a considerable FOIA practice. He or other litigants might have found themselves aligned against the Justice Department or the FBI in another case before the same judge. Evidence of judicial partiality might justify disqualifying the judge from acting in another case. Judge Quinn will not be acting in another case. Further, there is no reason to suppose that the information contained in the autopsy report and toxicology test results might cast any light on the conduct of his office.

United States Courts of Appeal have similarly held that the balance favors disclosure where the public record evidences official misconduct in office:[59]

---

[59] *Castaneda v United States*, 757 F2d 1010 (CA 9, 1985); *Sullivan v Veterans Administration*, 617 F Supp 258, 259-260 (D DC, 1985); *Columbia Packing Co v United States Dep't of Agriculture*, 563 F2d 495 (CA 1, 1977).

See also *Stern v Federal Bureau of Investigation*, 237 US App DC 302, 312; 737 F2d 84 (1984), where the United States Court of Appeals for the District of Columbia Circuit held that the FBI could withhold the identities of two of three censured FBI agents under the law enforcement privacy exemption, but required the identity of the third higher level employee to be disclosed, and said:

[T]he basic purpose of the FOIA is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *National Labor Relations Board v Robbins Tire & Rubber Co,* 437 US 214, 242; 98 S Ct 2311, 2327; 57 L Ed 2d 159 (1978) [citation omitted]. Therefore, courts favor disclosure under the FOIA balancing test when a government official's actions constitute a violation of public trust. [*Cochran v United States,* 770 F2d 949, 956 (CA 11, 1985).]

There is no claim, in the present case, of misconduct in office. There is, rather, a hint of misconduct out of office by a person who was in office. The drug paraphernalia were found at Judge Quinn's mother's home, not in his chambers.

United States Courts of Appeal have held that the privacy interests of persons investigated for possible wrongdoing by the Watergate Special Prosecution Force, but not indicted or prosecuted, are "legitimate and substantial," and "cannot be overridden by a general public curiosity" so as to warrant disclosure. *Fund for Constitutional Government v Nat'l Archives & Records Service,* 211 US App DC 267, 277; 656 F2d 856 (1981). The same analysis was applied to information that revealed facts about persons who were not targets

There is a decided difference between knowing participation by a high-level officer in such deception and the negligent performance of particular duties by the two other lower-level employees.

United States district courts have held that the balance favors disclosure where a disclosure statute requires that information be publicized, and the record sought to be suppressed is evidence of noncompliance with such a disclosure statute. *Congressional News Syndicate v United States Dep't of Justice,* n 1 *supra; Dow Jones & Co, Inc v United States Dep't of Justice,* 724 F Supp 985 (D DC, 1989).

of criminal investigation.[60]

The court of appeals rejected the argument that the law-enforcement records exception was inapplicable because "the individuals to whom it relates are high level government and corporate officials whose interest in privacy is at best minimal":[61]

> [While] an individual's status as a "public figure" . . . might somewhat diminish an individual's interest in privacy, *the degree of intrusion occasioned by disclosure is necessarily dependent upon the character of the information in question.* As we have already indicated, revelation of the fact that an individual has been investigated for suspected criminal activity represents a significant intrusion on that individual's privacy cognizable under [the law enforcement privacy exemption]. The degree of intrusion is indeed potentially augmented by the fact that the individual is a well known figure and the investigation one which attracts as much national attention as those conducted by the [Watergate Special Prosecution Force]. *The disclosure of that information would produce the unwarranted result of placing the named individuals in the position of having to defend their conduct in the public forum outside of the procedural protections normally afforded the accused in criminal proceedings.* [*Id.,* p 276. Emphasis added.]

Judge Quinn's family in the instant case is similarly incommoded by disclosure. Although no criminal proceeding was ever contemplated by the medical examiner, disclosure of the autopsy report and test results might subject Judge Quinn's fam-

---

[60] In refining the categories of information properly exempt from disclosure under the investigative records exemption of the federal FOIA, the district court had approved deletions made "on the grounds that they revealed the medical or emotional condition of individuals" identified in the investigative reports. *Fund for Constitutional Government v Nat'l Archives & Records Service, supra,* p 272, n 14.

[61] *Id.,* p 273.

ily to reputational loss. There is no appropriate forum to address the effects of disclosure; Judge Quinn cannot defend himself, and his family should not be placed in the position of having to do so.[62]

The court in *Bast* also rejected the contention that "the hope of protecting privacy already is forlorn" because "the transcript alteration incident already has received substantial public attention":

> In this case, however, previous publicity consisted of little more than journalistic speculation. While such publicity may well invade personal privacy, its accuracy is not established. By contrast, the information revealed in the twelve agency documents carries the imprimatur of an official investigation. The authoritative nature of such findings threatens much greater damage to an individual's reputation than newspaper articles or editorial columns. For this reason, publicity in the popular media cannot vitiate the FOIA privacy exemption for official information. Furthermore, renewed publicity brings with it a renewed inva-

---

[62] See also *Chairman, Criminal Justice Comm v Freedom of Information Comm,* 217 Conn 193, 196; 585 A2d 96 (1991), barring disclosure of a performance evaluation of a state's attorney under a general exemption that permitted withholding of " 'personnel or medical files and similar files the disclosure of which would constitute an invasion of personal privacy.' " The FOI Commission insisted that the "state's attorney, as a public official has 'minimal or nonexistent' privacy rights in information related to his official conduct." The court, however, took account of the potential for embarrassment and the reasonableness of the individual's expectation of privacy in determining that release of the information would constitute an invasion of privacy:

> The fact that the FOIA implicates first amendment concerns of access to information . . . does not necessarily imply that first amendment constraints on the personal privacy rights of public figures control the application of statutory privacy exemptions under the FOIA. [*Id.* at 198-199.]

See also *Napper v Georgia Television Co,* 257 Ga 156; 356 SE2d 640 (1987).

sion of privacy. The renewed intrusion is subject, in its own right, to FOIA protection. [*Bast v United States Dep't of Justice*, p 437.]

C

The question narrows to whether the FOIA requires the medical examiner to provide information in his files that might tend to show that a judge was using a prohibited substance, albeit in private, but nevertheless in violation of law because it is against the law to use a prohibited substance even in private.

If the autopsy report and test results were to show that this judge was using prohibited substances, and the media publicized that report, it is unlikely that there would be a clamor to root out substance abuse by judges and other elected officials. Absent other evidence, the public would probably assume—rightfully so—that this is aberrant and not typical judicial behavior. Possibly I am being naïve, but I have no reason to believe that any such use is other than atypical judicial behavior. If I am correct in that belief, then the asserted public need to know is simply curiosity or voyeurism, similar to the curiosity interest that in *Reporters Committee* was found insufficient to outweigh the privacy interest.

In assessing the validity of that conclusion, I have in mind that if Judge Quinn had entered a public hospital for treatment for substance abuse, a third party, such as the news media, could not compel disclosure of the record because of the FOIA exemption for medical records.[63]

To hold that disclosure of an autopsy report and toxicology test results is required would be to

_____

[63] See text immediately preceding n 52. When invoked, this exemption appears to be absolute and not to permit balancing. See also n 54.

create a narrow adventitious exception—from the general rule that medical records of a person's substance abuse are not public records[64]—for suicidal elected officials. This is a relatively small group. A rule of law requiring the disclosure of the autopsy test results for suicidal elected officials will only occasionally reveal evidence of prohibited substance abuse at home, as distinguished from lawful alcoholic substance abuse at home.

Clearly, there should be at least an in camera examination by a circuit judge of the test results to determine whether they show prohibited substance abuse.[65] The judge should redact any evidence of lawful alcoholic substance abuse. He should also redact any other embarrassing information, such as evidence of AIDS, venereal disease, and other potentially embarrassing details regarding the judge's personal or lifestyle history, or genetic history, which last might be particularly embarrassing and personal to his relatives who share that genetic history.

Requiring disclosure of the autopsy test results for suicidal elected officials will result most infrequently in providing the public with useful information about their former elected officials with a view to a change in legislation. "[T]he privacy

[64] FOIA exemption, § 13(1)(m), and the patient-physician privilege. See n 54.

[65] Section 10(1) of the FOIA provides:

> The court, on its own motion, may view the public record in controversy in private before reaching a decision. [MCL 15.240(1); MSA 4.1801(10)(1).]

See *Bast v United States Dep't of Justice, supra,* p 437, where the United States Court of Appeals examined in camera each of the twelve documents involved before concluding that disclosure was required of only a three-sentence passage in one of the documents.

In the instant case, the medical examiner requested an evidentiary hearing which was refused by the circuit court, and the Court of Appeals affirmed that decision. 184 Mich App 668.

interest far outweighs the incremental benefit to the public" in revealing law violation in private by a former elected official. *Bast, supra,* p 437.

If the person involved were an airline pilot, an operator of a subway train in New York City, a railroad engineer, or a bus driver, disclosure of test results revealing lawful alcoholic substance abuse, or prohibited substance abuse, might be within the FOIA purpose because such evidence might indicate a need to randomly test persons who operate such public conveyances. I doubt that revealing that Judge Quinn was using a prohibitive substance would be thought to justify random testing of judges for prohibited substance abuse.

If the person involved were a public health worker, evidence of AIDS or venereal disease might arguably be disclosable because of the public need to know that such a person suffered from a highly contagious and dangerous disease.

Nor does the balance change because Judge Quinn was the Chief Judge. The only pertinent difference between Judge Quinn and other judges is the process that elevated him to the office of Chief Judge. I doubt whether informing judges of multijudge courts that Judge Quinn used a prohibited substance would have any effect on future elections of chief judges. The information suggests nothing about potential prohibited substance abuse of other judges who might seek to become chief judges. Nor do I think that the information would cause the justices of this Court to revise the selection process, or that we are likely to require random drug testing of chief judges, any more than we are prepared to require random testing of judges generally.

I conclude that public disclosure of an autopsy report and toxicology test results concerning possible prohibited substance abuse by a former judge

in private would not inform the public about "what their Government is up to," and would reveal "little or nothing" about, and would not shed "any light on the conduct of a Government agency or official." I would therefore hold that the privacy interest of Judge Quinn's family in nondisclosure outweighs the public interest in disclosure, and would reverse the decision of the Court of Appeals.

MALLETT, J. (*dissenting*). I concur with Justice LEVIN's separate opinion. I wish to indicate my agreement with parts I, II, III, and VI. I do not agree with the analysis presented in parts IV and V, but nevertheless agree with the opinion's conclusion.