# Order

**Michigan Supreme Court**
**Lansing, Michigan**

April 9, 2021

Bridget M. McCormack,
Chief Justice

Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch,
Justices

160012

HASSAN M. AHMAD,
        Plaintiff-Appellee,

v

UNIVERSITY OF MICHIGAN,
        Defendant-Appellant.

SC: 160012
COA: 341299
Court of Claims: 17-000170-MZ

_____/

On order of the Court, leave to appeal having been granted and the Court having considered the briefs and oral arguments of the parties, the judgment of the Court of Appeals is AFFIRMED by equal division of the Court.

ZAHRA and CLEMENT, JJ., would vacate this Court's March 6, 2020 order granting leave and deny the application for leave to appeal because of the interlocutory posture of this case.

VIVIANO, J. (*concurring*).

I would vacate our order granting leave to appeal in this case. I am inclined to believe that the Court of Appeals reached the correct result regarding the meaning and application of MCL 15.232(i)—a provision of the Freedom of Information Act (FOIA), MCL 15.231 *et seq.*—but as the dissent below demonstrates, the application of that provision is not entirely clear. It defines as a public record one "prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function . . . ." MCL 15.232(i). The question here is whether a private individual's archives, given to the University of Michigan Bentley Historical Library under the condition that the contents not be made publicly available for a period of time, is subject to FOIA as a public record. Rather than resort to the broad purposes behind FOIA to determine the definition of "public record" and resolve the case today, I would wait until we could assess whether the materials here, even if deemed public records, fall within FOIA's personal-privacy exemption, MCL 15.243(1)(a). That statutory exemption could provide critical context for interpreting MCL 15.232(i) or obviate the need for such an interpretation altogether.

MCCORMACK, C.J. (*dissenting*).

I respectfully dissent. The University of Michigan Bentley Historical Library's storage of a private citizen's personal writings and papers, subject to a limited-use agreement, does not transform those documents into public records for purposes of the Michigan Freedom of Information Act (the FOIA), MCL 15.231 *et seq.* The Court's affirmance by equal division means that litigation will proceed and the university will presumably invoke the FOIA's personal-privacy exemption, MCL 15.243(1)(a), to prevent disclosure, but it should not have to do so because the materials are not within the FOIA's scope.

The Legislature helpfully stated the FOIA's purpose in its opening text: to provide the public with "full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees, consistent with this act." MCL 15.231(2). Since its enactment, we have repeatedly recognized that "the core purpose of FOIA [is] shedding light on the workings of government." *State News v Mich State Univ*, 481 Mich 692, 697 (2008). The FOIA defines a public record as a writing that is "prepared, owned, used, in the possession of, or retained by a public body *in the performance of an official function . . . .*" MCL 15.232(i) (emphasis added).

The Court of Appeals held that since an official function of a library is collecting and preserving archival materials, the private donor's writings, once accessioned into the collection—even if contractually under seal—are public records. Bad logic. And nobody claims that the sealed documents will shed any light on the Bentley Library's or the university's official functions. To compel the Bentley Library to disclose a private donor's writings would shed as much light on the affairs of government as requiring the nearby Ann Arbor District Library to disclose its copy of *Goodnight Moon* pursuant to a FOIA request. Neither disclosure would tell the public anything about the government entity housing the writing.

Adding insult to injury, the disclosure of archival materials acquired subject to certain donor-imposed restrictions undercuts the very function of collecting and preserving. It limits future public access to those primary sources that let a society know its own history. "Archivists fear the smell of burnt letters." Bilder, *The Shrinking Back: The Law of Biography*, 43 Stan L Rev 299, 330 n 176 (1992). For institutions like the Bentley Library, agreeing to temporary access restrictions for sensitive material is an important means of effectively fulfilling its mission of collecting and preserving. If Michigan's public institutions can't honor donor agreements, some people may simply opt to donate to private or federal archives. But capacity is limited, and many will instead withhold, censor, abandon, or even destroy historically significant documents.

There will be a materially adverse impact on Michigan's public libraries, museums, and archives.

We should avoid a myopic textualism that rips a word or phrase from its context and purpose in the statute. The Court of Appeals confused disclosure of the Library's policies and practices with disclosure of the contents of materials subject to limited-use agreements. The former are relevant to the library's public functions and thus subject to FOIA; the latter shed no light on government's workings at all. The Court of Appeals' miscarriage of logic will work to impede agreements like this one and inhibit public libraries and other public institutions from collecting certain types of materials going forward. I would have reversed the Court of Appeals and reinstated the Court of Claims' grant of summary disposition to the University.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In April 2010, Dr. John Tanton, an influential anti-immigration activist, donated 25 boxes of his personal papers to the University of Michigan's Bentley Historical Library. In accordance with the gift agreement between Dr. Tanton and the university, Boxes 15 through 25 were designated to be closed to the public, students, and faculty for 25 years. This is a common practice: the Bentley Library, like countless other public libraries, routinely enters into such gift agreements to ensure that important documents are preserved while mitigating any harm to living people from the release of those documents.

In December 2016, the plaintiff, immigration attorney Hassan Ahmad, sought to unseal these materials. Mr. Ahmad filed a FOIA request with the university for the release of "all documents donated by Dr. John Tanton, Donor #7087, located in Boxes 15-25 and any others marked 'closed' at the Bentley Historical Archive (BHA) [sic] at the University of Michigan." The university denied the request, and Mr. Ahmad sued in the Court of Claims. In response, the university moved for summary disposition under MCR 2.116(C)(8), arguing that Mr. Ahmad failed to state a claim for release of public records under the FOIA. The Court of Claims granted summary disposition to the university. But the Court of Appeals reversed, holding that the library's possession of the Tanton Papers was in the performance of its official function of collecting, preserving, and making available important documents for research purposes. As a result, the Court of Appeals concluded that the plaintiff had sufficiently pled that the Tanton Papers were "public records" under the FOIA. The university then appealed here, and we granted leave.

## II. LEGAL BACKGROUND

The FOIA tells us not just how the public may gain access to government documents, but also why the government grants that access. The statute states:

It is the public policy of this state that all persons, except those persons incarcerated in state or local correctional facilities, are entitled to full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees, consistent with this act. The people shall be informed so that they may fully participate in the democratic process. [MCL 15.231(2)].

Unless a statutory exemption applies, see MCL 15.243, a person who "provid[es] a public body's FOIA coordinator with a written request that describes a public record sufficiently to enable the public body to find the public record" is entitled "to inspect, copy, or receive copies of the requested public record of the public body," MCL 15.233(1). This access "protects a citizen's right to examine and to participate in the political process." *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 231 (1993). The FOIA, then, functions as an accountability guardrail. If "[s]unlight is said to be the best of disinfectants [and] electric light the most efficient policeman," Brandeis, *Other People's Money—and How the Bankers Use It* (New York: Frederick A. Stokes Co, 1914), p 92, then the FOIA's pro-disclosure statutory scheme aims to strengthen our democracy by supporting a well-informed citizenry.

Without a statutory exemption, public records must be disclosed. But because government entities do not have to disclose nonpublic records under the FOIA, the determination of what constitutes a "public record" is the first inquiry in FOIA litigation. The Legislature defines a public record as "[a] writing prepared, owned, used, in the possession of, or retained by a public body in the performance of an official function, from the time it is created." MCL 15.232(i). Here, the dispute centers on whether the Tanton Papers themselves—not the policies and practices through which the library acquired or maintains them—are somehow employed "in the performance of an official function." They are not.

## III. ANALYSIS

In construing a statute, it is always our goal to discover and give effect to the Legislature's intent. See, e.g., *Bisio v Village of Clarkston*, 506 Mich 37, 44 (2020); *People v Sharpe*, 502 Mich 313, 326 (2018); *People v Hardy*, 494 Mich 430, 439 (2013). We have tools for this. We start with the statute's text. When the text is clear, there is no need for us to do more work. *People v Lewis*, 503 Mich 162, 165 (2018); *Madugula v Taub*, 496 Mich 685, 696 (2014). When the text is less clear, courts resort to various canons of statutory construction and other tools for help: we consider a term's precise placement within a statutory scheme, see, e.g., *Sun Valley Foods Co v Ward*, 460 Mich 230, 237 (1999); look to similar statutes, construing the language *in pari materia*, see, e.g., *Potter v McLeary*, 484 Mich 397, 419 (2009); review the amendment history of a statute, see, e.g., *Bush v Shabahang*, 484 Mich 156, 167 (2009); or consider the

legislative history to find meaning in proposed but ultimately rejected alternate wordings, see, e.g., *In re MCI Telecom Complaint*, 460 Mich 396, 415 (1999).

Sometimes, though, the Legislature makes it easy for us. When the Legislature embeds a public-policy provision or a "purpose clause" in the statute's text, no crystal ball is needed. MCL 15.231(2) offers that clarity. The FOIA intends to provide the public with "full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees[.]" *Id.* That overriding purpose—though not dispositive, see *Int'l Union, United Plant Guard Workers of America v Dep't of State Police*, 422 Mich 432, 443 (1985)—provides a prism through which courts should interpret the FOIA's substantive provisions. Indeed, this Court has consistently relied on the FOIA's purpose clause to inform our understanding of the statute and its underlying legislative intent. See *Amberg v City of Dearborn*, 497 Mich 28, 33 n 4 (2014) (quoting the purpose clause to support the finding that the plaintiff was still entitled to fees and costs despite the intervening release of public records because of FOIA's purpose in "ensuring that people have 'complete information regarding the affairs of government' "); *Herald Co v Bay City*, 463 Mich 111, 121 (2000) (relying on the broadly worded phrase that all persons are entitled to "full and complete information" in the purpose clause to support its conclusion that the Legislature did not impose detailed or technical requirements that requestors describe the specific public records to be disclosed); *Bradley v Saranac Community Sch Bd of Ed*, 455 Mich 285, 304 (1997) (finding that the government's heavy redaction of a document disclosed in response to a FOIA request was "entirely at cross purposes with the FOIA," quoting the purpose clause's goal of providing "full and complete information" to those who request it).

To be sure, the FOIA's purpose provision is often invoked to support a broad reading that correctly categorizes the FOIA as a "prodisclosure" statute. See, e.g., *Herald Co*, 452 Mich at 121; *Kent Co Deputy Sheriff's Ass'n v Kent Co Sheriff*, 463 Mich 353, 360 n 13 (2000); *Swickard v Wayne Co Med Examiner*, 438 Mich 536, 544 (1991). But that prodisclosure policy preference is in service of providing "full and complete information regarding *the affairs of government* and *the official acts of those who represent them as public officials and public employees . . . .*" MCL 15.231(2) (emphasis added). Nobody claims that Dr. Tanton's papers provide any insight into the affairs or official acts of the Bentley Library or the university; their contents remain a mystery to Mr. Ahmad and the staff at the Bentley Library. It is, to put it mildly, difficult to be influenced by documents that you are contractually barred from reading for more than two decades.[1] Mr. Ahmad's FOIA request for the Tanton Papers is "entirely unrelated to

---

[1] At oral argument, the plaintiff's counsel suggested that because Dr. Tanton's advocacy and writings broadly affected immigration policy, the purpose clause cuts in the plaintiff's favor. Under this construction, the purpose clause's reference to "the affairs of government and the official acts of those who represent them as public officials and

any inquiry regarding the inner working of government, or how well the [University] is fulfilling its statutory functions . . . ." *Mager v Dep't of State Police*, 460 Mich 134, 146 (1999).

It is not a novel or remarkable conclusion that certain documents—despite being owned, possessed, used, or retained by a public entity—are not public records subject to disclosure under the FOIA. "[M]ere possession" of privately created records "is not sufficient to make them public records." *Amberg*, 497 Mich at 31; see also *Hopkins v Duncan Twp*, 294 Mich App 401, 409 (2011) ("Mere possession of a record by a public body does not, however, render it a public record . . . ."); *Howell Ed Ass'n, MEA/NEA v Howell Bd of Ed*, 287 Mich App 228 (2010) (same). The statute says so: A writing is not a "public record" unless the public body prepares, owns, uses, possesses, or retains it "*in the performance of an official function*." MCL 15.232(i). The statute's purpose clause, this Court's jurisprudence, and not least of all common sense support my view that the university's storage of the Tanton Papers is not in the performance of an official function.

We have addressed "performance of an official function" before. In *Amberg*, a criminal defense attorney filed a FOIA request with the city of Dearborn and the Dearborn Police Department, seeking copies of video surveillance tapes of his client that those government agencies had obtained from local restaurants. *Amberg*, 497 Mich at 30-31. The city and the police refused to provide the tapes, claiming they were not public records. *Id*. at 31. We disagreed because the city was not merely possessing the recordings, it was using them "as relevant evidence in a pending misdemeanor criminal matter." *Id*. at 32.

The *Amberg* Court approvingly cited a 1994 Court of Appeals opinion, *Detroit News, Inc v Detroit*, 204 Mich App 720 (1994). There, a newspaper filed a FOIA request seeking " 'records of all telephone calls to and from the office of Mayor Coleman A. Young and to and from [the Mayor's] Mansion.' " *Id*. at 721. The city took the view that the telephone bills were not public records, arguing that a public body's mere possession of the bills did not make them a public record. The city argued that it did not generate the bills, gather them, or use them and that they were unrelated to "the performance of an official function." *Id*. at 723. The Court of Appeals acknowledged that "mere possession of a record by a public body" does not make it a public record. *Id*. at 724-725. But the telephone bills—while prepared by a private entity—were obtained by public officials

---

public employees" is a reference to government writ large, not the governmental entity that possesses or uses the sought documents. While the purpose clause uses the broad term "the affairs of government," I am not persuaded that a FOIA request seeking documents that purportedly shed light on a distinct governmental entity at a different level of government falls within the statute's ambit. Even a prodisclosure statute has its reasonable limits.

and used to pay and document expenses incurred by public employees, which was conduct in the performance of an official function. *Id*. at 725.

*Amberg* and *Detroit News* show that possession alone is insufficient. In *Amberg*, 497 Mich at 32, the Dearborn Police Department not only possessed the video recordings, it relied on them to support its decision to issue a misdemeanor citation—an official function of government. In *Detroit News*, 204 Mich App at 725, the mayor's office not only possessed the telephone bills of public officials and employees, it used public funds to pay them, and the "[p]ayment and documentation of expenses incurred by public officials and employees is conduct in the performance of an official function."

In contrast, Mr. Ahmad asserts that the Bentley Library's act of possessing the Tanton Papers by itself constitutes the performance of an official function. Yes, the primary function of a library, unlike a mayor's office or a police department, is to store and make available documents for the benefit of the public. But unlike the records in *Amberg* and *Detroit News*, the university does not and will not—could not possibly—use the Tanton Papers to inform its governance, policy-setting, or decision-making in the performance of an official function. Indeed, no university official knows what the Tanton Papers contain.

The Court of Appeals broadly construed the university's purpose in a manner that would define "public records" to include any document that the Bentley Library possesses and makes available and any document that the Bentley Library intends to one day in the future make available to its students, researchers, and the public. The books that a university library makes available to students—or, in this case, the writings and archival materials a library warehouses for 25 years to make available in the future—are instrumentalities to further the university's function. But there is a significant distinction between such documents and the types of documents on which university officials rely to execute that educational function, like monthly financial statements, audits, minutes from library council meetings, and internal guidance documents about library management and the policies and practices according to which a library decides to enter into an agreement (like the one in this case). This latter set of documents reveals something about how the university functions and carries out its mission. Not so for a biology textbook found in the library stacks or several boxes of unopened Tanton Papers.

How a governmental entity uses the writing matters. In *Howell Ed Ass'n*, 287 Mich App 228, the plaintiff submitted a FOIA request to the Howell Public Schools seeking all e-mails, including personal e-mails, that had been sent to and from three teachers who were also union officials. The Court of Appeals sided with the defendant school district, observing that the FOIA "was not intended to render all personal e-mails public records simply because they are captured by the computer system's storage

mechanism as a matter of technological convenience." *Id*. at 247. Though "purely personal documents can become public documents based on how they are utilized by public bodies," that "subsequent use or retention" of the documents by the public body must be " 'in the performance of an official function.' " *Id*. at 243, quoting MCL 15.232(i). The university's "retention" of "purely personal documents" is not in the performance of any official function.

The Court of Appeals' analytical framework is premised on where the Tanton Papers are stored, not how they are used. Had Dr. Tanton donated his papers to the Ford School of Public Policy under the same agreement, the documents would not be "public records" under the Court of Appeals' analysis because the Ford School, unlike the Bentley Library, does not make it its central mission to collect, preserve, and make available archives to its students, researchers, and the general public. The Court of Appeals' analytical framework transforms the contents of the same unopened, unused boxes into public records when moved from the Ford School to the Bentley Library. That arbitrary distinction reveals the untenable foundation of the Court of Appeals' analysis.

## IV. CONCLUSION

When the Legislature speaks, courts listen. Or at least we're supposed to. I am concerned that in this case, the Court of Appeals missed the text that matters most in this dispute. The Legislature explained that it enacted the FOIA to provide Michiganders with "full and complete information regarding the affairs of government and the official acts of those who represent them as public officials and public employees . . . ." MCL 15.231(2). A private individual's sealed, donated writings to a library do no such thing. I would reverse.

CAVANAGH and WELCH, JJ., join the statement of MCCORMACK, C.J.

BERNSTEIN, J., did not participate due to a familial relationship.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

April 9, 2021

t0406



Clerk