*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LINDA HULLIBARGER,

Plaintiff-Appellant,

v

ARCHDIOCESE OF DETROIT, OUR LADY OF
MOUNT CARMEL PARISH, and FR. DON
LACUESTA,

Defendants-Appellees.

UNPUBLISHED
July 8, 2021

No. 354439
Monroe Circuit Court
LC No. 20-142805-NO

Before: REDFORD, P.J., and BORRELLO and TUKEL, JJ.

PER CURIAM.

Plaintiff's son committed suicide in early December 2018, but his family kept the manner of his death from the public. Plaintiff's pastor, defendant Father Don LaCuesta, officiated at the funeral and during his homily revealed the suicide of plaintiff's son to the public. He then proceeded to preach about suicide as a grave sin and specifically about how it endangered the immortal soul of plaintiff's son. The trial court concluded that Father LaCuesta's conduct was protected by the ecclesiastical abstention doctrine, and the negligent hiring, supervision and retention allegation, Count Three, was barred for other reasons as well, and thus granted summary disposition to defendants as to all claims. Finding no error in the circuit court's reasoning, we affirm its order.

## I. UNDERLYING FACTS

In early December 2018, plaintiff's son committed suicide. This fact was not publicly disclosed or known to anyone but close family and friends. The day after her son's death, plaintiff and her husband, Jeff Hullibarger (a nonparty), went to their church, defendant Our Lady of Mount Carmel Parish, and spoke with the pastor, Father LaCuesta, to plan for their son's funeral. Father LaCuesta informed the Hullibargers he could conduct a funeral service just a few days later and discussed the format of the service with them. The Hullibargers advised Father LaCuesta they wanted to celebrate their son's life and asked that the homily be positive, uplifting, and focused on the importance of kindness. Father LaCuesta agreed to conduct the service in the manner the

-1-

Hullibargers requested. At no point did the Hullibargers inform Father LaCuesta that their son had committed suicide, nor did Father LaCuesta state he was aware of their son's cause of death.

On the day of the funeral, "numerous family [members], friends, classmates, and community members" were in attendance. Once the service began, it "progressed as expected" until Father LaCuesta gave his homily. At that point, Father LaCuesta informed those in attendance that plaintiff's son had committed suicide. According to plaintiff's allegations, "[m]any in attendance . . . immediately became upset and burst out crying." Father LaCuesta's discussion of suicide stated that it was "condemned by the Church," a "secular crime," and "a sin against God with dire eternal consequences." As Father LaCuesta's sermon progressed, Jeff approached the pulpit and "pleaded" with Father LaCuesta to stop his discussion of suicide. But Father LaCuesta did not relent and "openly question[ed] the eternal fate" of the Hullibargers' son. After Father LaCuesta ended the funeral service, without allowing the family to say their final words, Jeff intervened once more. The funeral ended, and the Hullibargers informed Father LaCuesta he was not welcome at the gravesite service.

After the funeral, plaintiff learned that Father LaCuesta "had a prior history of such conduct." Thereafter, plaintiff requested an appointment with Archbishop Allen Vigneron of defendant Archdiocese of Detroit. Archbishop Vigneron agreed to meet with the Hullibargers, but when the Hullibargers met with Archbishop Vigneron and plaintiff brought up Father LaCuesta, Archbishop Vigneron "ended the meeting, telling her he wasn't there to discuss Father LaCuesta."

Plaintiff then sued defendants, alleging five counts: (1) intentional infliction of emotional distress; (2) misrepresentation; (3) invasion of privacy; (4) vicarious liability; and (5) negligent hiring, supervision, or retention. In lieu of an answer, defendants moved for summary disposition under MCR 2.116(C)(8). Defendants, relying on our Supreme Court's decision in *Winkler by Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327; 901 NW2d 566 (2017), argued plaintiff's claims were barred by the ecclesiastical abstention doctrine because they involved questions of ecclesiastical polity. Defendants also argued that Father LaCuesta's homily constituted protected speech and, even if plaintiff's claims could be adjudicated, they failed as a matter of law. Defendants also argued that the invasion of privacy claim failed for other reasons as well, which we discuss further.

After a change of venue from Wayne Circuit Court to Monroe Circuit Court, plaintiff responded to defendants' motion for summary disposition. Plaintiff argued the ecclesiastical abstention doctrine did not apply because this case concerned Father LaCuesta's conduct, "not the Church's creed," his speech was not protected, and she sufficiently stated valid claims against each defendant. At the hearing on defendants' motion for summary disposition, the trial court concluded the ecclesiastical abstention doctrine "clearly" applied to Father LaCuesta's sermon and granted summary disposition to defendants. This appeal followed.

## II. ECCLESIASTICAL ABSTENTION DOCTRINE

### A. STANDARD OF REVIEW

MCR 2.116(C)(8) mandates summary disposition if "[t]he opposing party has failed to state a claim on which relief can be granted." *Harbor Watch Condo Ass'n v Emmet Co Treasurer*, 308 Mich App 380, 384; 863 NW2d 745 (2014).

> A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant. A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery. When deciding a motion brought under this section, a court considers only the pleadings. [*Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999) (quotation marks and citations omitted).]

Thus, "[a] party may not support a motion under subrule (C)(8) with documentary evidence such as affidavits, depositions, or admissions." *Dalley v Dykema Gossett*, 287 Mich App 296, 305; 788 NW2d 679 (2010). "Conclusory statements, unsupported by factual allegations, are insufficient to state a cause of action." *Churella v Pioneer State Mut Ins Co*, 258 Mich App 260, 272; 671 NW2d 125 (2003). Furthermore, because a motion under MCR 2.116(C)(8) is based on the pleadings, discovery is not a consideration when a court determines whether to grant the motion. See *Maiden*, 461 Mich at 119-120. Finally, "[w]e likewise review de novo questions of subject matter jurisdiction and constitutional law." *Winkler*, 500 Mich at 333 (citation omitted).

### B. ANALYSIS

The ecclesiastical abstention doctrine "arises from the Religion Clauses of the First Amendment of the United States Constitution." *Winkler*, 500 Mich at 337. These clauses provide, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." US Const, Am I. The religion clauses of the First Amendment apply to the states through the Fourteenth Amendment. *Winkler*, 500 Mich at 337 n 4. Courts are "severely circumscribed by the First and Fourteenth Amendments to the United States Constitution and art 1, § 4 of the Michigan Constitution of 1963 in resolution of disputes between a church and its members." *Pilgrim's Rest Baptist Church v Pearson*, 310 Mich App 318, 323; 872 NW2d 16 (2015), overruled in part in *Winkler*, 500 Mich at 337-340. Our Supreme Court has stated that the applicability of the ecclesiastical abstention doctrine in Michigan

> reflects [the] Court's longstanding recognition that it would be "inconsistent with complete and untrammeled religious liberty" for civil courts to "enter into a consideration of church doctrine or church discipline," to "inquire into the regularity of the proceedings of church tribunals having cognizance of such matters," or "to determine whether a resolution was passed in accordance with the canon law of the church, except insofar as it may be necessary to do so, in determining whether or not it was the church that acted therein." [*Winkler*, 500

Mich at 337-338, quoting *Van Vliet v Vander Naald*, 290 Mich 365, 370-371; 287 NW 564 (1939).]

Under the ecclesiastical abstention doctrine, a civil court cannot "substitute its opinion in lieu of that of the authorized tribunals of the church in ecclesiastical matters." *First Protestant Reformed Church v DeWolf*, 344 Mich 624, 631; 75 NW2d 19 (1956). Therefore, the ecclesiastical abstention doctrine "operates to ensure that, in adjudicating a particular case, a civil court does not infringe the religious freedoms and protections guaranteed under the First Amendment." *Winkler*, 500 Mich at 339. But the doctrine does not "purport to deprive civil courts of the right to exercise judicial power over any given class of cases." *Id.* (quotation marks, ellipsis, and citation omitted). Indeed, "application of the ecclesiastical abstention doctrine is not determined by reference to the category or class of case the plaintiff has stated," and "[w]hether a claim sounds in property, tort, or tax, for instance, is not dispositive." *Id.* at 341. Further, whether a claim "is brought against a religious entity, or simply appears to be the sort that '*likely* involves ecclesiastical policies' " is not dispositive. *Id.*, quoting *Dlaikan v Roodbeen*, 206 Mich App 591, 593; 522 NW2d 719 (1994), overruled by *Winkler*, 500 Mich at 330, 336. "What matters instead is whether the actual adjudication of a particular legal claim would require the resolution of ecclesiastical questions; if so, the court must abstain from resolving those questions itself, defer to the religious entity's resolution of such questions, and adjudicate the claim accordingly." *Winkler*, 500 Mich at 341. Thus, the ecclesiastical abstention doctrine "requires a case-specific inquiry that informs how a court must adjudicate certain claims within its subject matter jurisdiction; it does not determine whether the court has such jurisdiction in the first place." *Id.*

The trial court did not err by concluding that resolution of plaintiff's claims would require a decision regarding matters of church doctrine and polity and, therefore, the ecclesiastical abstention doctrine applied to bar plaintiff's claims. Plaintiff argues her complaint does not seek resolution of religious issues. Rather, plaintiff asserts her claims concern an agreement by Father LaCuesta to preside over the funeral service for her son—for which Father LaCuesta was compensated through a donation—in accordance with requests from the Hullibarger family regarding the content of the funeral service. But the actual adjudication of each of plaintiff's claims would require an inquiry into religious doctrine and practices regarding sermons and funeral services, suicide, as well as why Father LaCuesta chose the words that he did, and personnel issues regarding hiring practices of the Catholic Church. "Religious doctrine refers to ritual, liturgy of worship and tenets of the faith." *Maciejewski v Breitenbeck*, 162 Mich App 410, 414; 413 NW2d 65 (1987), citing *Jones v Wolf*, 443 US 595; 99 S Ct 3020; 61 L Ed 2d 775 (1979).[1]

### 1. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The trial court properly applied the ecclesiastical abstention doctrine to bar plaintiff's claim for intentional infliction of emotional distress. Plaintiff alleged that Father LaCuesta "disclosed to everyone in attendance that her son had committed suicide" and that he had, therefore,

---

[1] "Although cases decided before November 1, 1990, are not binding precedent, MCR 7.215(J)(1), they nevertheless can be considered persuasive authority." *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2012) (citation omitted).

committed "a mortal sin, bringing his eternal salvation into jeopardy." Plaintiff further alleged that despite requests to stop, Father LaCuesta "proceeded to *preach* about" suicide. (Emphasis added). Additionally, plaintiff alleged Father LaCuesta caused her to lose religious faith and made it difficult for her to "practice[e] religion through the church." But to find that the content of Father LaCuesta's homily at the funeral regarding the suicide of plaintiff's son was "extreme" or "outrageous" would require the trial court to evaluate Catholic philosophy and doctrine regarding suicide, and whether Father LaCuesta complied with it. See *Lucas v Awaad*, 299 Mich App 345, 359; 830 NW2d 141 (2013) (explaining that to establish a prima facie case of intentional infliction of emotional distress, a plaintiff must establish, in relevant part, that the defendant's conduct was "extreme and outrageous," meaning it was "so outrageous in character, and so extreme in degree," that it "go[es] beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community"). It would also require evaluation of procedures for developing and providing religious sermons, which are unequivocally ecclesiastical in nature. See *Fowler v State of Rhode Island*, 345 US 67, 70; 73 S Ct 526; 97 L Ed 828 (1953) (stating that it is not "in the competence of courts under our constitutional scheme to approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings. Sermons are as much a part of a religious service as prayers."). Under *Winkler*, such an inquiry would be inappropriate; the trial court properly refused to make such an inquiry, by applying the ecclesiastical abstention doctrine with respect to plaintiff's claim for intentional infliction of emotional distress.

## 2. MISREPRESENTATION AND INVASION OF PRIVACY

The trial court similarly did not err when it concluded the ecclesiastical abstention doctrine barred plaintiff's claims of misrepresentation and invasion of privacy. Plaintiff's misrepresentation claim alleged, in part, that Father LaCuesta agreed to deliver a positive, uplifting sermon but, instead, spoke about "the nature of her son's death," and how it constituted a sinful act that brought into question "her son's eternal salvation." Plaintiff's invasion of privacy claim alleged that Father LaCuesta disclosed the cause of her son's death, Father LaCuesta should have known the cause of death "was a personal matter and not of public concern," and disclosure of the cause of death "was not consistent with any legitimate pastoral duty and/or concern to the public." But, as with plaintiff's claim of intentional infliction of emotional distress, evaluation of her misrepresentation and invasion-of-privacy claims requires an inquiry into the decision-making process behind drafting and giving religious sermons, as well as into Catholic doctrine and teachings regarding suicide, and, once again, the reasons Father LaCuesta chose to deliver the words he did. As stated earlier, courts should not evaluate sermons delivered at religious services. *Fowler*, 345 US at 70. Accordingly, the trial court properly concluded that resolution of these claims would require evaluating religious doctrines and, by extension, trigger the ecclesiastical abstention doctrine.

In addition, as to the invasion of privacy of claim, the trial court also relied on *Swickard v Wayne County Medical Examiner*, 438 Mich 536; 475 NW2d 304 (1991), to find that there was no privacy interest at issue which could have been violated. *Swickard* was a Freedom of Information Act (FOIA) case, involving an exemption for "[i]nformation of a personal nature where the public disclosure of the information would constitute a clearly unwarranted invasion of an individual's privacy." MCL 15.243(1)(a). In that case, the plaintiffs sought autopsy records of a deceased judge; the judge's family intervened and asserted privacy rights in the autopsy results. *Swickard*, 438 Mich at 540-542.

As a FOIA, case, *Swickard* is not strictly controlling. However, *Swickard* noted that because the Legislature had not defined the right of privacy, "We are left to apply the principles of privacy developed under the common law and our constitution." *Id*. at 546. Thus, *Swickard's* interpretation of the common law is relevant to plaintiff's common law invasion of privacy claim.[2] The Court cited and adopted the Restatement of Torts for the proposition that " 'Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a *living* individual whose privacy is invaded.' " *Id*. at 548, quoting 3 Restatement Torts, 2d, § 652I, p 403. As *Swickard* noted, the comments to the Restatement of Torts explain that

> "The right protected by the action for invasion of privacy is a personal right, peculiar to the individual whose privacy is invaded. The cause of action is not assignable, and it cannot be maintained by other persons such as members of the individual's family, unless their own privacy is invaded along with his." [*Swickard*, 438 Mich at 549-550, quoting 3 Restatement Torts, 2d, § 652I, comment *a*, p 403.]

Again relying on comments to the Restatement of Torts, *Swickard* also noted that "an action for invasion of privacy cannot be maintained by a relative of the person concerned, unless that relative is brought into unjustifiable publicity," *id*. at 551, or in other words, if the subjects involved were "not . . . of legitimate public concern," *id*. at 550. The Court provided a list of subjects which constitute authorized publicity, which includes suicide "and many other similar matters of genuine, even if more or less deplorable, popular appeal." *Id*. at 551 (quotation marks and citation omitted). Consequently, the trial court was correct in concluding that plaintiff had no cognizable privacy interest in the fact that her son committed suicide.

## 3. VICARIOUS LIABILITY AND NEGLIGENT HIRING, SUPERVISION, OR RETENTION

Finally, the trial court also correctly concluded that the ecclesiastical abstention doctrine barred plaintiff's claims for vicarious liability and negligent hiring, supervision, or retention. Under her claim of vicarious liability, plaintiff alleged, in part, that Father LaCuesta was under the supervision and control of the Archdiocese of Detroit and he "act[ed] in his special role of priest and adviser, using the premises of the Archdiocese's parish," and the "trust, power and the authority his position granted him." And, under her claim for negligent hiring, supervision, and retention, plaintiff alleged that Father LaCuesta was "unfit and/or incompetent to perform" his pastoral duties and that the Archdiocese of Detroit knew, or should have known, that Father LaCuesta previously engaged in similar conduct as that alleged in plaintiff's complaint. Additionally, plaintiff alleged that despite the Archdiocese of Detroit's knowledge of Father LaCuesta's incompetence, it still hired, supervised, and retained him as the pastor of Our Lady of Mount Carmel Parish.

---

[2] *Swickard* "recognize[d] that the common law and constitutional law may not be coextensive with the scope of privacy under the FOIA." *Swickard*, 438 Mich at 547. That limitation of course is inapplicable to plaintiff's common law claim.

As defendants point out, however, "[t]he Roman Catholic Church is an hierarchical organization and the Bishop's power to make assignments of ministers to a parish is certainly a matter of ecclesiastical polity in which the courts may not interfere." *Maciejewski*, 162 Mich App at 414. This point has been repeatedly reaffirmed by other Courts. See *Winkler*, 500 Mich at 342-343, citing *Hosanna-Tabor Evangelical Lutheran Church & Sch v EEOC*, 565 US 171, 184; 132 S Ct 694; 181 L Ed 2d 650 (2012) ("[t]he Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own"); *Hosanna-Tabor* 565 US at 188 (noting that the "authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone."). Michigan courts have uniformly reached the same conclusion. See *Borgman v Bultema*, 213 Mich 684, 703; 182 NW 91 (1921); *Assemany v Archdiocese of Detroit*, 173 Mich App 752, 762-763; 434 NW2d 233 (1998); *Maciejewski*, 162 Mich App at 414. The trial court thus properly dismissed plaintiff's claim involving the hiring, supervision and retention of Father LaCuesta, as those decisions by the Church are constitutionally protected.

Accordingly, the trial court did not err when it concluded the ecclesiastical abstention doctrine barred plaintiff's claims of vicarious liability and negligent hiring, supervision, and retention against the Archdiocese of Detroit. Furthermore, plaintiff's claims of vicarious liability and negligent hiring, supervision, and retention fail because Father LaCuesta's actions were constitutionally protected, and there can be no liability for a principal if the agent has committed no actionable wrong. See, e.g., *Rogers v JB Hunt Transp, Inc*, 466 Mich 645, 652; 649 NW2d 23 (2002) (holding that "a master's liability is derivative of the servant's"). In addition, plaintiff's complaint failed to state specific allegations against Our Lady of Mount Carmel Parish. Consequently, the trial court did not err in dismissing plaintiff's claims against the Parish.[3]

## III. CONCLUSION

Father LaCuesta's conduct was protected by the ecclesiastical abstention doctrine. As such, we cannot pass judgment on the content of his sermon. Consequently, all of plaintiff's claims necessarily fail. Count Three fails for the additional reason that plaintiff alleges no cognizable privacy interest which was invaded. We therefore affirm the trial court's order granting summary disposition to defendants. "In light of the public question involved, the parties may not tax costs." *Tennine Corp v Boardwalk Commercial, LLC*, 315 Mich App 1, 22; 888 NW2d 267 (2016).

/s/ James Robert Redford
/s/ Stephen L. Borrello
/s/ Jonathan Tukel

---

[3] Given our conclusion that the trial court properly concluded the ecclesiastical abstention doctrine barred plaintiff's claims, we need not address plaintiff's other arguments on appeal. We note, however, that while summary disposition is often premature if discovery is not closed, *Peterson Novelties, Inc v City of Berkley*, 259 Mich App 1, 24-25; 672 NW2d 351 (2003), discovery is not a factor here because defendants moved for summary disposition under MCR 2.116(C)(8) and such motions are based on the pleadings, see *Maiden*, 461 Mich at 119-120.